**Norman KAMERMAN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**Saul STEINBERG, Reliance Group Holdings, Inc., Reliance Group, Inc., Reliance Financial Services Corp., and Reliance Insurance Company, Defendants.**

Nos. 84 Civ. 4440 (CBM), 84 Civ. 4550 (CBM), 84 Civ. 4654 (CBM), 84 Civ. 4665 (CBM) and 84 Civ. 8001 (CBM).

United States District Court, S.D. New York.

Oct. 27, 1988.

Kaufman, Malchman, Kaufmann & Kirby by Irving Malchman, New York City, for plaintiff Kammerman.

Wolf, Haldenstein, Adler, Freeman & Herz by Daniel W. Krasner, New York City, for plaintiffs Brown and Rosen.

Paul, Weiss, Rifkind, Wharton & Garrison by Lewis A. Kaplan, Alan Blumstein, New York City, for defendants Saul Steinberg, Reliance Group Holdings, Inc., Reliance Group, Inc., Reliance Financial Services Corp., and Reliance Ins. Co.

## OPINION

MOTLEY, District Judge.

These consolidated cases, filed in 1984, arise out of an alleged scheme by Saul Steinberg to "greenmail" the Walt Disney Company (Disney). Plaintiffs contend that Defendants filed materially misleading Schedule 13D forms, in violation of Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), 78m(d), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Having already made a number of rulings, this opinion deals with the three remaining motions before the Court:

1) by opinion of September 9, 1986, this Court denied Plaintiffs' motion for class certification. *Kamerman v. Steinberg*, 113 F.R.D. 511 [1986–87] Fed.Sec.L.Rep. (CCH) ¶ 92,913 (S.D.N.Y.1986) (Motley, J.). Plaintiffs are now moving for reconsideration of that decision;

2) in our opinion of March 3, 1988, this Court denied both sides' motions for summary judgment on the non-derivative federal claims. *Kamerman v. Steinberg*, 681 F.Supp. 206 [1987–88] Fed.Sec.L.Rep. (CCH) ¶ 93,658 (S.D.N.Y.1988) (Motley, J.). We reserved judgment regarding Defendants' motion for summary judgment on the federal claims in the shareholder derivative suit brought by Plaintiff Kamerman on Disney's behalf;

3) finally, the court neglected to rule on Defendant's motion for summary judgment with respect to Plaintiffs' claim that Defendants should have announced on Monday morning, June 11, 1984, their negotiations with Disney the day before (the sub-class claim). By order of April 6, 1988, Defendants' motion for reargument was granted solely on this issue which is once again before the Court.

A detailed summary of the facts of the case can be found in the latter *Kamerman* opinion mentioned above. *Kamerman*, 681 F.Supp. at 206, Fed.Sec.L.Rep. at ¶ 93,658. It is unnecessary to repeat them here.

## I. MOTION FOR SUMMARY JUDGMENT ON DERIVATIVE FEDERAL CLAIMS

Defendants have moved for summary judgment with respect to violations of Section 10(b) and 13(d) of the Act and Rule 10b–5 as alleged in the derivative suit, 84 Civ. 4550, brought by Plaintiff Kamerman on Disney's behalf. They claim that Disney lacks standing to bring the federal claims and that those claims are nonetheless barred by a release granted to Defendants by Disney. Since this Court agrees with Defendants that Disney does not have standing to bring the derivative federal claims, the validity of the release need not be considered.

A litigant bringing a federal securities fraud action typically must allege that a misrepresentation caused the litigant to effect a securities purchase or sale. *See Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194, [1987–1988] Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,645, 97,945 (1988); *Wilson v. Commontech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981); *Samuel M. Feinberg Testamentary Trust v. Carter*, 664 F.Supp. 140, 142 (S.D.N.Y.1987). Here, the only purchase or sale of securities at issue is Disney's repurchase of Steinberg's Disney holdings on June 11, 1988. Moreover, the litigant in this case must be Disney since the cause of action in a derivative suit belongs to the corporation. *Falkenberg v. Baldwin* [1977–1978] Fed.Sec.L.Rep. (CCH) ¶ 96,086 at 91,911 (S.D.N.Y.1977) [available on WESTLAW, 1977 WL 1025]. The sum of these propositions is that Plaintiffs cannot bring the federal securities claims on Disney's behalf unless the company *itself* was

victimized through some misrepresentation by Defendants in connection with the buy-back of Steinberg's Disney stock. If Plaintiffs fail to make this showing, the derivative suit must be dismissed as a matter of law for lack of standing.

In the circumstances of this case, it is difficult to imagine what that misrepresentation could be. The gravamen of Plaintiffs' complaint is that Steinberg concealed his true intention in launching the tender offer which was merely to coerce Disney into buying back his shares at a premium. Viewed this way, it would be silly to say that Steinberg concealed his plan to resell his shares to Disney at a premium since that is exactly what happened. In contrast to evidence that would indicate Disney's reliance on Defendants' allegedly fraudulent conduct, the record shows that Disney knew what it was doing and got what it bargained for. With respect to Disney, the undisputed facts indicate nothing more than Steinberg offering to sell his Disney shares at a premium and the company buying them back to stop his takeover bid. Since the facts are clear and the record is devoid of any evidence of misrepresentation by the Defendants in connection with the repurchase, Plaintiffs' derivative federal claims must be dismissed for lack of standing and summary judgment granted to Defendants as a matter of law.[1]

## II. RECONSIDERATION OF MOTION TO CERTIFY THE CLASS

■ Plaintiffs' original motion for class certification was denied solely on the ground that the named representatives could not adequately protect the interests of the class as required by Fed.R.Civ.Pro. 23(a)(4). *Kamerman v. Steinberg*, 113 F.R.D. 511 [1986–87] Fed.Sec.L.Rep. (CCH) ¶ 92,913 (S.D.N.Y.1986) (Motley, J.) There were two reasons for this: first, Plaintiffs Kamerman and Stepak had potential conflicts of interest in their dual role as class representatives and plaintiffs in separate derivative suits brought on Disney's behalf. *Id.* at 516, Fed.Sec.L.Rep. at 94,447–48; secondly, the lawyers of the named parties could not agree as to the appropriate class to be certified and were arguing among themselves rather than cooperating in the prosecution of this action. *Id.* at 518, Fed. Sec.L.Rep. at 94,449.

Plaintiffs now state that these problems have been solved and seek reconsideration of the ruling denying class certification. Without seeking a redetermination of the conflict of interest issue, they propose that Plaintiffs Kamerman and Stepak be dropped as class representatives and that Plaintiffs Brown, Rosen, Lexim Investors Corp. and Dohsa Anstalt Corp. be the named class members. Plaintiffs also state that they have fully resolved their differences, are cooperating with each other, and have engaged in extensive and coordinated discovery such that they now agree on the proposed class to be certified. The class proposed is all persons who purchased Disney common stock between May 25 and June 11, 1984, inclusive, and who were damaged by Defendants' alleged manipulation of the market in Disney securities during that period.

Defendants stated at oral argument that their main objection to Plaintiffs' motion was "procedural". If so, it is not much of an objection: Fed.R.Civ.Pro. 23(c)(1) grants this Court the power to reconsider an order denying class certification at any time before a decision on the merits. *Walsh v.*

---

1. Plaintiffs' attempt to save the derivative suit by applying the holding of *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), is unavailing. In *Goldberg*, as in the cases which followed it, the Court held it to be a sufficient allegation of fraud for purposes of Section 10(b) that interested corporate directors lulled minority shareholders into inaction by failing to disclose information that would have allowed those shareholders to seek state court relief to enjoin certain corporate transactions. Noting that *Goldberg* involved "out-and-out 'looting' and 'stealing' " by the corporation's directorate, the Second Circuit has recently stated that *Goldberg* should be reserved for those cases in which "the remedy of an injunction is needed (and is available under state law) to prevent *irreparable injury* to the company from *willful misconduct* of a *self-serving nature ...*" *Field v. Trump*, 850 F.2d 938, 948 (2d Cir.1988) (italics added). No such dramatic contentions are made in this case about Disney's Board.

*City of Detroit,* 412 F.2d 226, 227 (6th Cir.1969).[2]

Having read the submissions and listened to Plaintiffs' counsel at oral argument, this Court is now convinced that Plaintiffs will fairly and adequately protect the interests of the class. Counsel has demonstrated that they are capable of prosecuting this case in a coordinated and cooperative manner. Moreover, the proposed class dovetails nicely with Plaintiffs' theory of the case presented in the earlier motions for summary judgment. *See Kamerman v. Steinberg,* 681 F.Supp. 206 [1987–88] Fed.Sec.L.Rep. (CCH) ¶ 93,658 (S.D.N.Y. 1988) (Motley, J.). In those papers, Plaintiffs alleged that discovery had uncovered conversations between Steinberg's attorney (Hodes) and Disney's attorney (Flom) as early as May 24, 1988, regarding a buyback of Steinberg's Disney holdings. In upholding Plaintiffs' claims against Defendants' motion for summary judgment, this court ruled that the existence and substance of these conversations—if proved—could show that Steinberg's Schedule 13D amendments filed between May 25–June 8, 1984, were inaccurate and incomplete. Having already decided that Plaintiffs' evidence presented genuine issues of material fact for trial, this Court implicitly approved the factual basis for the class period now proposed.

As to the conflicts of interests of named class representatives Kamerman and Stepak, that issue is also resolved. Stepak has been dropped from the masthead and Kamerman's derivative suit has been dismissed. As a result, Kamerman may continue as a named class representative along with the others now proposed by Plaintiffs.

As all the original objections to class certification have been overcome, Plaintiff's motion to certify the class is granted. As soon as possible, Plaintiffs should submit a proposal and order to the Court providing for notification of class members.

## III. THE SUBCLASS CLAIM

Plaintiffs also ask this Court to certify a subclass of all persons who purchased Disney stock on Monday, June 11, 1984, the day the repurchase agreement was publicly announced. The subclass is made up of investors who bought Disney stock that day in reliance on Steinberg's public statements and amended Schedule 13D announcing a tender offer for Disney the Friday before. When Disney revealed—after the market closed on Monday—that weekend negotiations had resulted in a stock repurchase and withdrawal of the tender offer, Disney's stock plunged along with the fortunes of the Monday investors. They now argue that even if Steinberg did intend to buy the company as of Friday, June 8th, Section 10(b) of the Act and Rule 10b–5 mandated disclosure of his weekend negotiations with Disney before the market opened on June 11th. "The subclass claim is that ... a public announcement of a tender offer rendered demonstrably false within two days by subsequent events such as those of June 9 and 10 ... must be corrected before the market opens on the next trading day." Plaintiffs' Surreply Memorandum In Opposition to Defendants' Motion for Reargument at p. 2.

Defendants respond that the weekend negotiations were immaterial as a matter of law and did not have to be disclosed under Section 10(b) and Rule 10b–5. Defendant's Reply Memorandum in Support of Motion for Reargument at p. 5. They argue further that even if the negotiations were material, Steinberg was justified in withholding the information on Monday because important "standstill" agreements remained to be negotiated with his co-venturers and Disney's Board had not yet approved the deal. *Id.* at 6. Finally, they claim that Steinberg's disclosure obligations were governed solely by Section 13(d) of the Act requiring amendment of a Schedule 13D "promptly" after any

---

**2.** Fed.R.Civ.Pro. 23(c)(1) says:

As soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained. *An order under this subdivision may be conditional, and may be altered or amended before a decision on the merits* (italics added).

changes in material facts. Rule 13d-2, 17 C.F.R. § 240.13d-2. Defendants say this requirement was satisfied by Steinberg's June 13th amendment announcing the withdrawal of the tender offer and the sale of his Disney holdings back to Disney. *Id.* at 3.

*Discussion*

■ Recently, in *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 [1987–1988] Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,645 (1988), the Supreme Court declined to adopt a bright-line test for when corporations must disclose preliminary merger negotiations to the investing public in order to avoid liability under Section 10(b) of the Act and Rule 10b-5. Instead, the Court opted for a case-by-case approach in which materiality for purposes of those provisions depends on the facts and circumstances of each individual situation. "No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material ... [M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented ·information." *Id.* at ——, 108 S.Ct. at 987–88, Fed.Sec.L.Rep. at 97,948. In adopting a less rigid test, the Court reaffirmed the "fundamental purpose" of the different Securities Acts "to substitute a philosophy of full disclosure for ... *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Id.* at ——, 108 S.Ct. at 984–85, Fed.Sec.L.Rep. at 97,946.

We think that the flexible standard adopted by the Court in *Basic* rebuts Defendants' claim that the weekend discussions cannot be considered legally material. That Disney's Board had yet to approve the deal and "standstill" agreements remained to be worked out do not render the negotiations immaterial as a matter of current law. The weekend talks were neither idle conversation nor mere exploratory overtures: a price was set and the important terms of the transaction agreed upon. As this Court has previously said, discussions between two parties over the sale of a large block of stock assume particular rele-

vance when the stockholder's desire to sell represents a sharp break from his prior public positions. *SEC v. Gaspar,* [1984–1985] Fed.Sec.L.Rep. (CCH) ¶ 92,004, 90,-977–78 (S.D.N.Y.1985) [available on WEST-LAW, 1985 WL 521] (Motley, J.). Having just announced a tender offer forty-eight hours before, the weekend negotiations between Steinberg and Disney would have been especially significant to those Monday investors moving quickly to take advantage of Steinberg's takeover bid. The case-by-case approach adopted in *Basic* coupled with its emphasis on full disclosure in securities transactions leads us to the conclusion that this particular question of materiality can and should go to a jury. This court believes that, under *Basic,* a jury could correctly find that a substantial likelihood existed that disclosure of the previous weekend's negotiations between Disney and Steinberg would have been significant to a reasonable investor deciding whether to purchase Disney stock on Monday, June 11, 1984. *See Basic,* 485 U.S. at ——, 108 S.Ct. at 986, Fed.Sec.L.Rep. at 97,945.

Defendants press the point that, even if the weekend negotiations were material, Monday's silence was justifiable since the "standstill" agreements remained to be settled and Disney's Board had not yet approved the deal. They cite *Staffin v. Greenberg,* 672 F.2d 1196 (3d Cir.1982), where the Court quoted with approval this passage from the American Stock Exchange Manual:

Occasionally corporate developments give rise to information which, although material, is subject to rapid change. If the situation is about to stabilize or resolve itself in the near future, it may be proper to withhold public announcement until a firm announcement may be made, since successive public announcement concerning the same subject but based on changing facts may confuse or mislead the public rather than enlighten it. *Id.* at 1206.

We think that *Staffin* and other cases cited by the Defendants are readily distinguishable from the present situation. First, they do not involve circumstances in which a reporting person has already made

a public statement allegedly rendered misleading by subsequent events; secondly, they do not involve rapid and unusual market activity in the issuer's stock caused by those prior statements. In light of his prior announcement of the tender offer and the flurry of market activity it generated, it is disingenuous of Steinberg to argue that disclosure of the weekend negotiations would have done more harm to the Monday investors than good. If Defendants really were concerned that disclosure of these talks would have been misleading under the federal securities laws, they have not satisfied this Court that it was impossible to devise a press release accurately reflecting the current state of affairs between Steinberg and Disney as of the start of business on Monday morning. As is customarily true with disclosure, the truth would have been sufficient. We disagree with Defendants that Steinberg justifiably remained silent while "standstill" agreements were worked out and the Disney Board met on Monday, June 11th. It taxes the judicial imagination to hold that federal securities law mandated Defendants' silence to protect the very persons now suing him for not speaking up.

■ Defendants' final objection is that Steinberg's disclosure obligations were governed solely by Section 13(d) of the Williams Act and Rule 13d–2 promulgated thereunder.[3] This rule required Steinberg to "promptly" amend his Schedule 13D after any material changes in the facts outlined in his original filing. Steinberg claims he satisfied the rule by filing his final 13D amendment on June 13, 1984, two days after the repurchase agreement with Disney was consummated and revealed (this amendment announced the withdrawal of the tender offer and the buy-back of Steinberg's Disney holdings). He argues that he had no additional obligation under Section 10(b) and Rule 10b–5 to disclose the weekend negotiations and, moreover, that such disclosure would upset the legislative purposes of the Williams Act. We disagree.

When a corporation such as Reliance "voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events." *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir.1984) (citing *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 346–47 (E.D.Pa.1979)). The law in this and other Circuits establish a general duty to correct under Section 10(b) and Rule 10b–5: "[i]t is now clear that there is a duty to correct or revise a prior statement which was accurate when made but which has become misleading due to subsequent events." *Ross v. A.H. Robins, Co.*, 465 F.Supp. 904, 908 (S.D.N.Y.1979), *reversed on other grounds*, 607 F.2d 545 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802; *See Butler Aviation International, Inc. v. Comprehensive Designers, Inc.*, 425 F.2d 842, 843 (S.D.N.Y.1970); *SEC v. Shattuck Denn Mining Corporation*, 297 F.Supp. 470, 475–76 (S.D.N.Y. 1968); *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir. 1981), *citing Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir.1980) and *Electronic Speciality Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir.1969); *Thomas v. Duralite Co.*, 386 F.Supp. 698, 715 (D.N.J.1974), *affirmed as to liability and reversed and remanded as to damages*, 524 F.2d 577 (3d Cir.1975); *Greenfield, supra*. Moreover, "a particular duty to correct a specific prior statement exists as long as traders in the market could reasonably rely on the statement." *Ross* at 908.

The subclass claim is that Steinberg should have informed investors buying Disney on Monday, June 11th, about the events of June 9–10th, since those weekend negotiations left his June 8th announcement of a tender offer materially misleading as of that following Monday. Such a theory is cognizable under Section 10(b) and Rule 10b–5 since our analysis of the cases shows that these provisions impose a duty on Defendants "to correct ... prior

---

**3.** The 1968 Williams Act, 82 Stat. 454 *et seq.*, codified at 15 U.S.C. §§ 78m(d)–(e) and 78n(d)– (f), adding new sections 13(d), 13(e) and 14(d)– (f) to the Act.

statements when they became aware of subsequent events which rendered those statements misleading." *Id.* This means that a jury could reasonably conclude that as of the start of business on Monday, June 11th, Steinberg should have revealed to the investing public the previous weekend's negotiations with Disney which cast serious doubt on the continued vitality of his June 8th announcement. Having failed to disclose the repurchase agreement until after it was consummated and the tender offer withdrawn, a jury could hold Defendants liable for damages under Section 10(b) and Rule 10b–5 to those investors who relied on the June 8th announcement when they decided to purchase Disney stock on Monday, June 11th. *See Ross, supra,* at 908. Irrespective of a jury's ultimate findings in this case, the determination that the events of the weekend of June 9–10th rendered Steinberg's June 8th announcement materially misleading under Section 10(b) and Rule 10b–5 is a question of fact not appropriately resolved in a motion for summary judgment.[4]

We reach these conclusions fully mindful of the legislative history of the Williams Act and of Section 13(d) in particular. As the Second Circuit has stated, Section 13(d) is an early warning system designed "to alert the marketplace to every large, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control ..." *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). In calling for information about the identity and intentions of certain shareholders, 13(d) signals investors "to potential changes in corporate control so that they they [can] properly evaluate the company in which they had invested

or were investing." *Id.* at 720. By mandating such disclosure, 13(d) furthers the general purpose of the Williams Act "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975). However, "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts ... [E]xtreme care ... was taken to avoid tipping the balance of regulation either in favor of management or the person making the takeover bid." *Id.*

Given Congress' intent, it is difficult to imagine how disclosure of the weekend negotiations would have frustrated the purposes of the Williams Act. Defendants have not said how such disclosure would have unfairly favored Disney's management in the takeover struggle or otherwise deterred Steinberg's takeover bid. Nor have they demonstrated that investors or potential investors in Disney would have been ill served by complete and up to the minute information about the tender offer. To the contrary, accurate disclosure of the substance of the weekend talks on Monday morning would have assured that investors possessed sufficient current information to make an informed decision on whether to buy, sell, or hold Disney that day. Far from subverting Congressional intent, this Court believes that disclosure of those negotiations would have been completely consistent with the legislative purpose of Sec-

---

4.  Our analysis is supported by the public statements of the Securities and Exchange Commission. Reviewing the cases under Section 10(b) and Rule 10b–5, the SEC has written that "depending on the circumstances, there is a duty to correct statements made in any filing, whether or not the filing is related to a specific transaction or event, if the statements have either become inaccurate by virtue of subsequent events, or are later discovered to have been false and misleading from the outset, and the issuer knows or should know that persons are continuing to rely on all or any material portion of the statements. [citations omitted]

This duty will vary according to the facts and circumstances of individual cases. For example, the length of time between the making of the statement and the occurrence of the subsequent event, as well as the magnitude of the deviation, may have a bearing upon whether a statement has become materially misleading." Sec. Act Rel. 6084, 17 SEC Dock 1048, 1054 (1979).

tion 13(d) and the general intent of the combined provisions making up the Williams Act. We cannot say, as Defendants urge, that the reporting scheme set up by the Williams Act would be eviscerated if Steinberg is also held to his disclosure obligations under Section 10(b) and Rule 10b–5.

As the Second Circuit has noted, it is "neither unusual nor unfortunate" that conduct regulated by one part of the Act is also subject to regulation under another. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 554 (2d Cir.1979) (quoting *S.E.C. v. National Securities*, 393 U.S. 453, 468, 89 S.Ct. 564, 573, 21 L.Ed.2d 668 (1969)). In *Ross*, the Court held that the Plaintiff could maintain an action under Rule 10(b) and Section 10b–5 even though the conduct complained of also violated the Act's Section 18.[5] Noting that open market investors are one of the "prime beneficiaries" of Section 10(b) and Rule 10b–5, the Second Circuit found no reason to insulate statements filed with the S.E.C. from scrutiny under those provisions. *Id.* at 556. The *Ross* Court wrote that no rational purpose exists to limit available relief for misleading information "simply because the misinformation happened to be lodged in a form filed with the S.E.C." *Id.* To do so, the opinion concludes, would simply protect misleading market information from suits by potential plaintiffs who nonetheless relied on it in making their open market purchases. *Id.*

Underlying the Court's ruling was the idea that the individual provisions of the federal securities laws are not exclusive of one another, but " 'constitute interrelated components of the federal regulatory scheme governing transactions in securities.' " *Id.* at 551 (citing *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed. 668 (1976)).

In accordance with the logic of the *Ross* court, we can also find no rational purpose in shielding Defendants from 10(b)/10b–5 liability simply because Steinberg had a concurrent obligation to update his designs on Disney through "prompt" amendments to his original Schedule 13D. The determination that an amendment is "prompt" under Rule 13d–2 is a question of fact to be determined from the attendant circumstances of each individual case. *Scott v. Multi–Amp Corporation*, 386 F.Supp. 44, 61 (D.N.J.1974); *SEC v. GSC Enterprises*, 469 F.Supp. 907, 914 (N.D.Ill.1979); *In the Matter of Cooper Laboratories Inc.*, Sec. Ex. Act Release 22171 (1985).[6] However, even if Steinberg's final 13D amendment was found to be "prompt", it would not affect his potential responsibility to the subclass under Section 10(b) and Rule 10b–5. The duty to amend a Schedule 13D under Rule 13d–2 does not eliminate or diminish Defendants' liability under Section 10(b) and Rule 10b–5 to investors damaged through reliance on materially misleading

---

**5.** Section 18, § 15 U.S.C. § 78r, creates a private remedy for persons who buy or sell securities in reliance on any "false or misleading" statements contained in "any application, report, or document" filed with the S.E.C. pursuant to the 1934 Act.

**6.** According to the Securities and Exchange Commission:

No bright line test has been adopted in order to determine when an amendment to a Schedule 13D is "prompt" ... Strong policy considerations indicate that the "prompt" amendment requirement should be construed flexibly in order to comport with the circumstances of the particular case. Thus, the question of whether an amendment is prompt will be determined based on all of the facts and circumstances surrounding both prior disclosures by the filing person and the material changes which trigger the obligation to amend. [citation omitted]

Whether an amendment to a Schedule 13D is "prompt" must be judged, at least in part,

by the market's sensitivity to the particular change of fact triggering the obligation to amend, and the effect on the market of the filing person's previous disclosures. Although the promptness of an amendment to a Schedule 13D must be judged in light of all the facts and circumstances of a particular situation, any delay beyond the time the amendment reasonably could have been filed may not be deemed to be prompt. *In the Matter of Cooper Laboratories*, Sec. Ex. Act Rel. 22171, pp. 8–9 (1985).

Under these standards, a jury could reasonably conclude from the circumstances of this case that Steinberg's final amendment to his Schedule 13D—submitted on June 13, 1984— was not filed promptly for purposes of Rule 13d–2. We therefore decline to rule, as Defendants request, that no genuine issue of material fact exists and that this amendment was prompt as a matter of law.

market information for which Defendants are responsible. Nothing in the legislative history of the Williams Act suggests otherwise. To the contrary, our conclusion is virtually dictated by the "fundamental purpose" of the securities laws which—as we have already noted—substitute a "philosophy of full disclosure ... for *caveat emptor*" in order to achieve "a high standard of business ethics in the securities industry." *Basic*, 485 U.S. at 224, ___, 108 S.Ct. at 978, 984, Fed.Sec.L.Rep. at 97,946. A participant in the securities markets should not be immunized from liability under Section 10(b) and Rule 10b–5 simply because he has acquired five per cent of a company's outstanding stock. We find it disingenuous of Defendants to argue that Steinberg's final 13D amendment satisfied the sum total of his disclosure obligations under the federal securities laws. Coming two days *after* the repurchase agreement was consummated and the tender offer withdrawn, that filing neither warned investors of the changing intentions of a major Disney shareholder nor stopped information alleged to be materially misleading from substantially influencing the marketplace. It does no good to yell "watch out!" after someone has fallen off the ledge. Since we do not believe that the Williams Act in general and Section 13(d) in particular were meant to excuse or justify conduct arguably fraudulent under the 1934 Act, we hold that Plaintiffs' subclass claim will lie under Section 10(b) and Rule 10b–5.

On the basis of the above discussion, Plaintiffs proposed subclass is certified and Defendants' motion for summary judgment on the subclass claim is denied. The subclass will be comprised of all persons who purchased Disney common stock on June 11, 1984, and who were allegedly damaged as a result of Steinberg's failure to disclose—before the start of trading that day—the weekend negotiations between himself and Disney of June 9–10, 1984. Plaintiffs should submit a proposal and order to the Court providing for notification of the subclass members.

