Howard NELSON, SREP, Plaintiff,

v.

PARAMOUNT COMMUNICATIONS, INC., and Martin S. Davis, Defendants.

No. 94 CIV 5014 (CBM).

United States District Court, S.D. New York.

Dec. 22, 1994.

---

Avrom S. Fischer, New York City, for plaintiff.

Stewart J. Baskin, Andrew W. Feinberg, Sherman & Sterling, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### I. Background.

This case arises out of the events leading up to the eventual merger of Paramount Communications, Inc. ("Paramount") with Viacom, Inc. ("Viacom").[1] Paramount issued

---

1. For purposes of these motions to dismiss, the well-pleaded allegations of the Amended Complaint are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1848– 1849, 23 L.Ed.2d 404 (1969); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). However, "legal conclusions, deductions or opinions couched as factual allegations are not given

senior notes paying 5.88% interest (the "Paramount notes") on July 12, 1993. (¶¶ 1, 11).[2] These notes were offered to the public pursuant a registration statement that Paramount filed with the Securities and Exchange Commission on July 12, 1993. (¶ 1). On July 15, 1993, Nelson paid $50,000 for Paramount notes in the face amount of $50,000. (¶ 9). Subsequently, the price of the Paramount notes declined significantly and has never recovered. (¶ 16).

As discussed more fully below, Nelson contends that this decline in value is due to two matters of material fact that Paramount improperly omitted from the registration statement for these notes.

First, Nelson asserts that prior to the date of the registration statement, Paramount's board of director's was aware of and had either approved of or acquiesced in conduct by Paramount management which sought to pursue negotiations that would likely lead to a change in control of Paramount. (¶ 15).

Second, Nelson contends that prior to the date of the registration statement Paramount's management anticipated that QVC Network, Inc. ("QVC") would make a hostile bide to take over control of Paramount. (¶ 15).

Nelson concludes that these omissions constitute violations of Sections 5 and 11 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77k (1988), by Paramount and its Chief Executive Officer ("CEO") and Chairman of its Board of Directors, Martin S. Davis.

### A. The Allegedly Material Events.

Plaintiff bases his claims upon the facts as recited by the Delaware Court of Chancery in *QVC Network v. Paramount Communications*, 635 A.2d 1245 (Del.Ch.1993), *aff'd*, 637 A.2d 34 (Del.1994) which he attaches as an exhibit to his complaint. According to the Delaware court, Paramount and Viacom began merger negotiations on April 20, 1993 and continued into the summer of that year. *QVC Network*, 635 A.2d at 1248–49. On July

1, 1993, the parties signed confidentiality agreements. *Id.* at 1249. On July 6, the parties had reached an agreement in principle on three points: (1) each share of Paramount stock would be exchangeable for 0.10 shares of Viacom Class A stock and 0.90 shares of Viacom Class B stock; (2) Martin S. Davis of Paramount would be the CEO of the new company; and (3) Sumner M. Redstone, the CEO of Viacom, would be the controlling shareholder. *Id.* "However, on July 7[,1993], the parties reached an impasse over issues of price and lockup stock options." *Id.* For example, with regard to price, while Viacom's proposal was for a package worth $60.85 to $65.00 per share, Paramount was seeking a price starting somewhere in the $70s. *Id.* Thus, as of July 7, negotiations between the two corporations broke down. *Id.* During the summer, the parties did "remain[ ] in contact." *Id.* Actual negotiations did not, however, resume until August 20, 1993. *Id.* These negotiations again broke down on August 25, 1993. *Id.* It was not until September that negotiations leading to a fruitful result resumed and concluded. *Id.* at 1250.

With regard to QVC's involvement, Paramount and its CEO, Defendant Martin S. Davis, first became aware of QVC's rumored interest in a hostile takeover bid in June 1993. *Id.* at 1252 n. 12. At that time, Mr. Davis called a QVC investor named John Malone to ask him to discourage QVC from making such a bid. *Id.* After the termination of negotiations with Viacom, Mr. Davis invited Barry Diller, the CEO of QVC, to lunch and told him that Paramount was not for sale. *Id.* at 1249. Diller responded that he had no intention at that time of making any bid. *Id.* It was not until September 20, 1993, after Paramount had reached an agreement with Viacom, that Mr. Diller first launched his hostile takeover campaign. *Id.* at 1252.

### B. The Motion to Dismiss.

Defendants have filed a motion to dismiss the complaint pursuant to Rules 12(b)(6) and

---

a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988) (citation omitted).

**2.** References to relevant paragraphs in the Complaint are cited to as "(¶ __)."

9(b) of the Federal Rules of Civil Procedure. Defendants assert three bases [3] for dismissal: (1) failure to state a claim upon which relief can be granted under Section 11; (2) failure to plead fraud with adequate particularity under Rule 9(b); and (3) failure to state a claim upon which relief can be granted under Section 5. These bases are treated separately below.

## II. The Standard For Dismissal Under Rule 12(b)(6).

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. 918, 927 (S.D.N.Y.1989). Therefore, on a motion to dismiss, all factual allegations of the complaint must be accepted as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–2233, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991), and all reasonable inferences must be made in plaintiffs' favor. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Meilke v. Constellation Bancorp*, No. 90–3915, 1992 WL 47342, at *1 (S.D.N.Y. Mar. 4, 1992). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d at 1067 (citation omitted).

## III. The Standard of Materiality Applicable to Plaintiff's Section 11 Claim.

The question is whether Paramount's failure to disclose any of the above-described events in the July 12, 1993 registration statement constitutes an omission of material fact in violation of Section 11. Un-

der the securities laws, for an event or fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court addressed the question of how this standard of materiality applies to preliminary merger negotiations. The Court expressly rejected the view that merger negotiations are immaterial as a matter of law until the parties have reached an agreement-in-principle as to price and structure. *Id.* at 236, 108 S.Ct. at 986. Instead, *Basic* adopted the standard previously articulated by the Second Circuit in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Under that standard, "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'" 485 U.S. at 238, 108 S.Ct. at 987. In adopting this test, the *Basic* Court noted that it is a very fact-specific standard. *Id.* at 239–40, 108 S.Ct. at 987–88.

Even before the *Basic* decision, the Second Circuit had held that this standard of materiality is applicable to Section 11 claims. *See Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731–32 (2d Cir.1987),[4] *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). More recently, this court has been among those to note that the flexible standard articulated in *Basic* governs questions regarding the materiality of contingent events. *See, e.g., Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. 918, 929–30 (S.D.N.Y.1989); *Kamerman v. Steinberg*, 123 F.R.D. 66, 71 (S.D.N.Y.1988).

---

**3.** Defendants originally also asserted that Plaintiff had failed to plead compliance with the applicable statute of limitations. However, in their Reply Memorandum, Defendants withdrew this claim. (Reply Mem.Supp.Def.'s Mot. Dismiss Compl. at 10 n. 5.)

**4.** Note that with regard to preliminary merger negotiations, *Kronfeld* adopted the agreement-in-principle exception subsequently rejected in *Basic*. *See* 832 F.2d at 733–34.

Even under this standard, it does not appear that Nelson can establish a material omission. In order to grant Nelson the benefit of the doubt to which he is entitled, it is important to remember that Paramount and Viacom had reached an agreement in principle on some key issues prior to the breakdown in their negotiations. However, at the time of the registration statement at issue here, all Paramount knew with regard to Viacom was that negotiations had broken off but the two corporations were still "in contact." Even if one stretches the concept of preliminary negotiations as far as it can go, remaining in contact with someone after one has broken off formal negotiations does not seem to be included. Stated another way, to call this state of affairs material would make just about anything at all material. *Cf. TSC Indus.*, 426 U.S. at 448–49, 2131–32 (noting that a standard of materiality that is too low would lead corporations to bury shareholders in a mass of trivial information); *Kamerman*, 123 F.R.D. at 71 (negotiations between a corporation and a "greenmailer" are material when "a price was set and the important terms of the transaction agreed upon); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 484 (S.D.N.Y.1994) (holding there was genuine issue of material fact as to whether facts regarding merger negotiations were material when there was evidence that, *inter alia,* negotiations over price were continuing, corporate parties were engaged in continuous exchange of non-public business information, and financial and legal advisors were directly and substantially participating in preparing for and facilitating the merger).

As for the QVC takeover bid, at the time of the registration statement, all Paramount knew was that QVC was rumored to be interested in such a bid and that when confronted by Mr. Davis, Mr. Diller of QVC denied any interest in such a bid. Again, to call this a material set of facts seems like a stretch. *Cf. Zuckerman v. Harnischfeger Corp.*, 591 F.Supp. 112, 119 (S.D.N.Y.1984) (noting that " '[a] company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company.' ")

While events subsequent to the date of the registration statement may have been material, Section 11 by its own terms is limited to material omissions in parts of registration statements that were misleading "when such part[s] became effective." *See also Hartford Fire Ins. v. Federated Dep't Stores,* 723 F.Supp. 976, 988 (S.D.N.Y.1989) (refusing "to assess materiality with the 20/20 hindsight afforded by a completed takeover"). Thus, Defendants prevail on this issue.

## IV. The Applicability of Rule 9(b) and Rule 8.

While Defendants contend that the requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply to Section 11 claims, the law in the Southern District appears to be to the contrary. In *In re Ann-Taylor Stores Sec. Litig.,* 807 F.Supp. 990, 1003 (S.D.N.Y.1992) (citations omitted), this court noted that "[b]ecause proof of fraud is not necessary to prevail on a Section 11 claim, courts have long held that Rule 9(b) does not apply to a section 11 claim." *See also In re College Bound Consol. Litig.,* No. 93 CIV. 2348 (MBM), 1994 WL 172408, at *3 (S.D.N.Y. May 4, 1994). *But see In re Chaus Sec. Litig.,* 801 F.Supp. 1257, 1264–67 (S.D.N.Y.1992) (suggesting limited applicability of Rule 9(b) to Section 11 claims). Thus, this basis for dismissal is without merit.

Defendants also argue that Plaintiff has not even satisfied the short-plain-statement standard under Rule 8. They base this contention on Nelson's reliance on the Delaware court opinions as his statement of facts. According to the Defendants, Plaintiff's asking the court to examine these decisions places an inappropriate burden on the court.

A court considering a motion to dismiss under Rule 12(b)(6) or Rule 9(b) can consider attached exhibits or documents incorporated into the complain by reference. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991); *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). However, it is an entirely different matter to suggest that it is this court's responsibility to review extrinsic materials and to make an editorial selection as to what part, if any, of a foreign court's findings would support a lawsuit.

This is not the practice envisioned by the Federal Rules. *Cf. Levitch v. Columbia Broadcasting System, Inc.*, 94 F.R.D. 292, 295 (S.D.N.Y.1982), *aff'd*, 697 F.2d 495 (2d Cir.1983) ("the liberal rules of pleading in the federal system are not without limits."). Since the court does not read the Complaint herein as invoking the doctrines of res judicata or estoppel, Nelson cannot be permitted to submit the opinions of other courts as the bulk of his statement of facts.

## V. Plaintiff's Section 5 Claim.

Defendants assert that Nelson's Section 5 claim must fail because Nelson has failed to plead either that there was no registration statement in effect or that there was not a valid prospectus. *See* 15 U.S.C. § 77e (1988). Nelson's presentation of his Section 5 claim is somewhat confused. He states that the Defendants are liable under Section 11 for violating Section 5. (Pl.'s Mem.Opp'n Mot. Dismiss at 8.) However, Section 11 provides a form of relief apart from Section 5. The express cause of action for violations of Section 5 is instead provided by Section 12. *See* 15 U.S.C. § 77*l* (1988).

 In *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1098–1100 (2d Cir.1972), the Second Circuit held that Sections 5(b)(2) and 10(a) of the Securities Act impose a duty upon issuers and their principals both to make any prospectus they deliver "true and correct," and to "amend or supplement" a prospectus if subsequent developments render it materially misleading as originally written. Arguably, events in this case subsequent to the date of the registration statement rendered the prospectus materially misleading.[5] However, Nelson does not have standing to raise these issues. He bought his notes three days after they were initially issued. The key events occurred after he made his purchase. Nelson therefore cannot be heard to complain that disclosure of any of these events would have significantly altered the total mix of information available to him at the date of his purchase.

---

**5.** Under current S.E.C. regulations, a prospectus must disclose any "material information ... as may be necessary to make the required state-

## Conclusion

For all of the above reasons, Defendants' motion to dismiss the Complaint is granted without prejudice to the Plaintiff's filing an amended complaint.

ments, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408 (1994).