**Hoi Ming Michael HO, et al., Others Similarly Situated, Plaintiffs,**

v.

**DUOYUAN GLOBAL WATER, INC., et al., Defendants.**

No. 10–CV–7233 (GBD).

United States District Court, S.D. New York.

Aug. 24, 2012.

548

Robin Bronzaft Howald, Glancy, Binkow & Goldberg LLP (N.Y.C), Fei–Lu Qian, Jeremy Alan Lieberman, Marc Ian Gross, Pomerantz, Haudek, Block, Grossman & Gross LLP, New York, NY, Ex Kano S. Sams, II, Lionel Z. Glancy, Robert V. Prongay, Glancy, Binkow & Goldberg, LLP, Los Angeles, CA, for Plaintiffs.

Brooke S. Murphy, Bruce W. Day, Charles B. Goodwin, Harry Arthur Woods, Jr., Mack J. Morgan, III, Tara A. LaClair, Crowe & Dunlevy, P.C., Oklahoma City, OK, Susan Elizabeth Huntsman, Crowe & Dunlevy, P.C., Tulsa, OK, Thomas J. Mullaney, Leventhal, Sliney & Mullaney, LLP, Roslyn, NY, James Ancone, Joseph De Simone, Terri Ann Mazur, Mayer Brown LLP, Lea Haber Kuck, Skadden, Arps, Slate, Meagher & Flom LLP, Adam Selim

Hakki, Christopher Richard Fenton, Jaculin Aaron, Shearman & Sterling LLP, Dennis H. Tracey, III, George Albert Salter, Joanna Felice Wasick, Hogan Lovells U.S. LLP, Nancy Chung, Jacqueline Gail Yecies, Peter Ian Altman, Akin, Gump, Strauss, Hauer & Feld, LLP, Michael Richard Young, Antonio Yanez, Jr., Willkie, Farr & Gallagher LLP, New York, NY, J. Christian Word, Katherine A. Schettig, Latham & Watkins, LLP, Washington, DC, Donna L. McDevitt, Frances P. Kao, Skadden, Arps, Slate, Meagher & Flom, LLP, Chicago, IL, for Defendants.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge.

Named Plaintiffs, Hoi Ming Michael Ho and Joseph Sciarro ("Lead Plaintiffs"), Initial plaintiff Mingli Li, and Plaintiff Huaying Jin, individually and on behalf of all other similarly situated, commenced this class action for violations of Sections 11 & 15 of the Securities Act of 1933, and Sections 10(b) & 20(a) of the Securities Exchange Act of 1934, against (1) Duoyuan Global Water, Inc. ("DGW" or "the Company"); (2) Wenhua Guo ("Guo"), the CEO, Chairman of the Board of Directors, and controlling shareholder of DGW, and Stephen C. Park ("Park"), CFO of DGW (collectively, "Management Defendants"); (3) Christopher P. Holbert, Joan M. Larrea, Thomas S. Rooney, Jr., Yuefeng Yu, Ping Wei, and Charles V. Firlotte, directors and former directors of DGW (collectively, "Director Defendants"); (4) Piper Jaffray & Co., Oppenheimer & Co., Janney Montgomery Scott, LLC, Credit Suisse Securities (USA) LLC, Macquarie Capital (USA) Inc., and Rodman & Renshaw, LLC, the underwriters of one or both of the Company's American Depositary Shares ("ADS") offerings (collectively, "Underwriter Defendants"); (5) Grant Thornton International Ltd. ("GTI") and BDO Limited (successor to Grant Thornton Hong Kong), the external auditors and authors of opinion letters in connection with DGW's financial statements (collectively, "Auditor Defendants"); and (6) the Global Environmental Fund ("GEF"), a company which held, through GEEMF III Holding MU, a large portion of shares of DGW prior to its public trading. Plaintiffs allege that Defendants made misrepresentations or omissions of material facts in DGW's SEC filings and press releases, which led to the decline in the market value of the Company's ADSs, resulting in significant financial injury to the Lead Plaintiffs and the class. Defendants DGW, the management Defendants, the Director Defendants, the Underwriter Defendants, Grant Thornton International, Ltd., and the GEF Defendants each move for dismissal of the Corrected Amended Complaint ("CAC") pursuant to Rule 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. DGW also moves to dismiss certain impermissible allegations pursuant to Federal Rule of Civil Procedure 12(f).

## FACTS

### The Parties

Defendant DGW is a China-based manufacturer and seller of water treatment products. (Am. Compl. ¶ 4). The Company develops water treatment technologies and products which it sells for municipal, industrial, residential and agricultural water treatment throughout China. (Id.).

Defendant Guo was Chairman of the Board of Directors and CEO of DGW. (Id. ¶ 41). Guo was also Chairman of the Board of Directors of Duo yuan Printing, Inc. ("DYP"), an affiliated company of DGW. (Id.). Defendant Park was CFO of DGW during the Class Period. Although he announced his resignation from the position of CFO on April 4, 2011, he had the

power and authority, along with Guo, to control and correct the content of DGW's reports to the SEC. (*Id.* ¶ 42–43).

DGW's Board of Directors was comprised of experts from a variety of fields. Defendant Holbert joined the Board in September 2008. He has been a Certified Public Accountant for more than ten years. (*Id.* ¶ 44). In addition, Holbert "founded a financial consulting firm providing advice for those doing business in China and served as the Director of Sarbanes Oxley compliance at Chinadotcom Corporation." (*Id.*). While serving on the Board, Holbert was a member of the Compensation Committee, as well as the Nominating and Corporate Governance Committee. (*Id.*). Holbert resigned from the DGW's board on August 26, 2009, and was replaced by Defendant Wei. (*Id.* ¶ 48). Wei had an "extensive" background in accounting, including several positions at private auditing firms. (*Id.*). Wei also was a Certified Public Accountant and a Chartered Accountant. (*Id.*). Wei resigned from the Board on April 20, 2011. (*Id.*).

Defendant Larrea joined DGW's Board on February 5, 2008, and resigned on April 20, 2011. (*Id.* ¶ 45). While on the Board, Larrea also was managing director at GEF. (*Id.*). In fact, Larrea was appointed to the DGW Board as a designee of Defendant GEEMF III Holdings MU, an affiliate of GEF. (*Id.*). Prior to joining DGW's Board, Larrea served as a "principle investment officer of International Finance Corporation (a member of the World Bank), which focuses upon financing private-sector investment in emerging markets." (*Id.*).

Defendant Rooney joined the DGW Board in June 2008 and resigned on January 1, 2010. (*Id.* ¶ 46). While on the Board, Rooney served as a member of DGW's Audit, and the Nominating and Corporate Governance Committee, and as the Chair of the Compensation Committee.

(*Id.*) Prior to joining DGW's Board, Rooney served as a CEO to a private company that rehabilitated water and sewer piping. (*Id.*).

In November 2009, Defendant Firlotte replaced Defendant Rooney, and assumed all of his Board and Committee member responsibilities. (*Id.* ¶ 49). Prior to joining DGW, Firlotte served in a myriad of positions related to water management, and is currently the CEO of the largest private water utility in New England. (*Id.*).

Defendant Yu joined the Board in August 2008. (*Id.* ¶ 47). Prior to joining DGW's Board, Yu served as a Vice President to a nonprofit organization. (*Id.*). According to DGW's IPO Form F–1 Defendant Yu is still serving as a DGW Board member. (*Id.*).

Grant Thornton International, Ltd. ("GTIL") is an umbrella organization comprised of independent registered public accounting firms world-wide. (*Id.* ¶ 58). Plaintiff alleges that GTIL signed, and therefore, represented that it had audited DGW's "financial statements as of December 31, 2008 and 2007 and for the years ended December 31, 2008, 2007, and 2006 included in the prospectus." (*Id.*). Plaintiffs further allege that GTIL "is currently DGW's outside auditor, through its member firm, Jingdu Tianhua, also known as 'GT–China.'" (*Id.*). According to the Complaint, during the relevant time period, 'GT–Hong Kong' ("GT–HK") also served as an outside auditor to DGW. (*Id.* ¶ 59). Plaintiffs allege that GT–HK "acted as an agent of GTI[L], in that GTI[L] requires a commitment of each member firm to the 'standards and values represented by the [GTIL] brand.'" (*Id.*).

Defendant GEF is a "pioneer in the area of private equity investment in innovative 'green' businesses." (*Id.* ¶ 61). In February 2008, GEF invested $30.2 million in

DGW to acquire a 20% stake in the Company. The acquisition was made through the use of Defendant GEEMF III Holdings MU, a private investment company. (*Id.*).

The Underwriter Defendants, Piper Jaffray & Co., Oppenheimer & Co., Jamey Montgomery Scott, LLC, Credit Suisse Securities (USA) LLC, Macquarie Capital (USA) Inc., and Rodman & Renshaw, LLC, are each either investment banks or financial services and investment firms. (*Id.* ¶¶ 51–56). The Underwriters each participated in negotiating the offering price of DGW ADSs in the IPO and/or SPO and solicited and sold shares to investors. (*Id.* ¶ 57).

*Alleged Material Misstatements by DGW and Defendants*

Plaintiffs allege that between June 24, 2009 and April 5, 2011 (the "Class Period"), Defendants materially misled investors regarding the financial circumstances of DGW through oral statements by executives, as well as misstatements in disclosure forms. On June 1, 2009, DGW filed a Form F–1 Registration Statement with the SEC so that it could commence a public offering. (*Id.* ¶ 72). The IPO took effect on June 24, 2009, and the Company filed the Prospectus June 25, 2009. (*Id.*).[1] The IPO Documents contained several financial disclosure forms in which Plaintiffs allege DGW misstated financial figures and overstated the number of its distributors and employees.[2] (*Id.* ¶¶ 76–83). On June 24, 2009, DGW commenced its initial public offering ("IPO") of 5,500,000 ADSs. (*Id.* ¶ 5). Each ADS represented two DGW ordinary shares, and were priced at $16.00

on the New York Stock Exchange ("NYSE"). (*Id.* ¶¶ 5–6).

After the IPO, in August of 2009, DGW reported its Q2'09 results: nearly a 50% increase in year-over-year net income and a gross margin of nearly 50%. (*Id.* ¶ 8). Around this time, DGW's ADSs traded for nearly doubled their initial IPO price. (*Id.*). In November 2009, Defendant Guo announced the Q3'09 results: increases in year-over-year revenue, operating income of more than 30%, gross margins near 50%, as well as an increased demand for all of DGW's products. (*Id.* ¶ 9). On January 19, 2010, DGW released preliminary reports that the Company's financial results during Q4'09 would outperform expectations. (*Id.* ¶ 10).

On January 11, 2010, prior to the preliminary release of Q4'09 results, DGW filed another Registration Statement in anticipation of a second public offering (SPO) of ADSs. (*Id.*). Plaintiffs allege that DGW misstated financial figures and overstated the number of its distributors and employees in the SPO Documents.[3] (*Id.* ¶¶ 87–96). DGW commenced the SPO on January 28, 2010, and each of the 3,545,000 ADSs was priced at $29.50. (*Id.* ¶ 11). In addition to DGW selling ADSs for the SPO, Defendant GEF was allowed to sell more than one-quarter of its 20% stake in the Company's ADSs. (*Id.*).

In March 2010, DGW announced that its 2009 operating results showed a continued growth in revenues. (*Id.* ¶ 13). Around that time, the Underwriter Defendants began promoting DGW's positive performance to potential investors, announcing

---

1. The Registration Statement and Prospectus are collectively referred to as the "IPO Offering Documents."

2. Plaintiffs also allege that the audits and accounting documents were not prepared in conformity with Generally Accepted Account-

ing Principles ("GAAP"). (Am. Compl. ¶¶ 117–21)

3. Plaintiffs allege that the financial information provided was not prepared in conformity with Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶¶ 117–21).

DGW's participation in conferences and events over the course of the year.[4] (*Id.* ¶ 14). DGW announced in May and August 2010 that the Company exceeded revenue expectations for Q1'10 and Q2'10, respectively. (*Id.* ¶ 15).

*DGW's Collapse*

On September 13, 2010, DYP, a company affiliated to DGW,[5] reported serious internal accounting discrepancies. (*Id.* ¶¶ 16, 97). On the same day, DYP announced the resignation of at least four members of its Board of Directors, its CEO, and its CFO. Plaintiff alleges that because of the close ties between the companies, the accounting discrepancies at DYP had serious implications for DGW. (*Id.* ¶ 18).

The same day that the accounting problems at DYP were announced, Piper Jaffray, one of the Underwriter Defendants, decreased DGW's price target from $34.00 to $9.00 per ADS. (*Id.* ¶¶ 19, 99). The Company's ADSs went on to lose approximately 41.55% of their value, and closed at $12.10 per share on September 13, 2010. (*Id.* ¶ 20). On September 14, 2010, due to DYP's accounting problems, DGW formed an Audit Committee to ensure that it did not have accounting problems of its own. (*Id.* ¶¶ 21, 100). As a result, Plaintiffs allege that DGW's ADS price rose by $0.51 (4.1%). (*Id.* ¶ 21). On the same day, how-ever, Janney Capital Markets, one of the Underwriter Defendants, warned investors not to rely on its previous ratings or estimates of DGW, and suspended its coverage of DGW. (*Id.*). In total, Plaintiff alleges that half of the Underwriter Defendants "sought to distance themselves from DGW" as a result of the accounting problems at DYP. (*Id.* ¶ 103).

On September 28, 2010, DGW announced that the Audit Committee retained Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates ("Skadden") to conduct a review of DGW's accounting among other things, and that a completed report was expected in one to four months. (*Id.* ¶ 22). According to Plaintiffs, the price of the Company's ADSs increased by nearly a dollar after this announcement. (*Id.*). However, on October 25, 2010, Auriga, an independent investment company that met with DGW management and toured the facilities, issued a research note[6] that raised three additional areas of concern for DGW unrelated to DYP's accounting problems.[7] (*Id.* ¶ 23). Plaintiff alleges that a 5.5% decrease of DGW's ADS price was a result of Auriga's research note. (*Id.* ¶¶ 23, 106).

On March 23, 2011, Defendant Guo announced that DGW ended fiscal year 2010 with revenues of more than 1 billion RMB. (*Id.* ¶ 24). The Board of Directors, howev-

**4.** In addition to negotiating the IPO and SPO prices, the Underwriter Defendants were responsible for soliciting and selling shares to investors. (*Id.* ¶ 57).

**5.** Although DYP is a non-party, Plaintiffs allege that DYP and DGW share close ties such as: (1) the same headquarters in China; (2) Defendant Guo served as the Chairman of both companies' Boards of Directors during the Class Period; (3) Defendant Guo is a majority owner in both companies; (4) Defendant Holbert held positions at both companies; and (5) Holbert's replacement at DYP was previously an employee of DGW. (*Id.* ¶ 17).

**6.** Plaintiffs have not acquired an actual copy of the research note, and the information allegedly reported on by Auriga was discovered through an online article that reported the contents of the research note. (*Id.* ¶¶ 23, 105–06).

**7.** The three areas of concern were: (1) the Company's capital expenditure on expansion when it was currently only 50% utilized and the resulting drain on the Company's balance sheet; (2) old equipment; and (3) DGW only making 10 products available for inspection out of the 109 that it produced. (*Id.* ¶ 23).

er, was unwilling to approve the results because Skadden had not received access to documents it had requested to review. (*Id.*). On the same day, Plaintiff alleges that Defendant Guo was evasive on an earnings call with financial analysts when questioned about the duration of the Skadden audit. (*Id.* ¶ 111). The following day, Rodman & Renshaw, an Underwriter Defendant, announced it had downgraded DGW from "market outperform" to "market perform." (*Id.* ¶ 113). Plaintiff further alleges that a number of disclosures on April 4, 2011 contributed to the continuing decrease of the Company's ADS price. (*Id.* ¶ 25). First, Muddy Waters, a research group, accused DGW of replacing the Company's actual 2009 audit report of DGW's Langfang subsidiary on file with the local branch of the State Administration for Industry and Commerce ("SAIC") in China with a forged version to cover up the fact that revenues had been "astronomically inflated." (*Id.* ¶ 25). Moreover, Muddy Waters posted a video on YouTube which allegedly showed that many of DGW's sales office phone numbers were inoperable. (*Id.*). The same day, Defendant Park announced that he was resigning as CFO of DGW "to pursue another professional opportunity." (*Id.*). On April 5, 2011, the Company's ADS closed at $3.21 after losing 41.5% of its value over the course of the previous two days. (*Id.* ¶ 26).

Trading of DGW was halted on April 6, 2011. (*Id.* ¶ 27). That day, the Board of Directors announced it was expanding the scope of Skadden's review of the company. (*Id.*). A Special Investigation Committee ("SIC") was formed, and Defendant Larrea served as its Chair. (*Id.*). Shares rebounded by 10% once trading resumed the following day. (*Id.*). On April 20, 2011, trading was halted again, and no news was released. (*Id.* ¶ 28). Weeks later, however, Plaintiffs allege that investors discovered that four members of the Board of Directors resigned on April 20, 2011, including Defendant Larrea. (*Id.*). According to Plaintiffs, the board members resigned in protest of DGW management preventing Skadden from accessing documents that were necessary for the audit. (*Id.*). In addition, investors discovered that Skadden withdrew as special counsel to the Audit and Special Investigation committees on April 21, 2011. (*Id.*). DGW publicly announced the resignations on May 4, 2011, and named replacements as well as new counsel to conduct the internal audit. (*Id.* ¶ 29).

## STANDING

*Plaintiffs' Standing to Assert a Section 11 claim Based on the SPO*

Plaintiffs allege that they have standing to sue based on the IPO and the SPO because they purchased ADSs pursuant to and/or traceable to the IPO and SPO Offering Documents. Plaintiffs assert that because the IPO and the SPO share the same defect, and all of DGW's shares must have come from either the IPO or the SPO, Plaintiffs can all allege the same injury against the Defendants for one or both of the offerings. In addition, Plaintiff argues that "[c]ourts have repeatedly certified classes where the class representatives had not invested in all of the subject securities." *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, No. 98 Civ. 4318, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000). However, the court in *In re Dreyfus* avoided the question of standing altogether by instead focusing on Rule 23(a)(3)'s typicality requirement. *See Hoffman v. UBS–AG*, 591 F.Supp.2d 522, 532 (S.D.N.Y.2008). "Standing concerns the scope of the courts' power in the first instance." *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

■ Stock purchasers who can trace their shares to an allegedly misleading registration statement and can allege that they have been injured by the registration statement have standing to sue under § 11. *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir.2003). When more than one registration statement is alleged as defective, Plaintiffs may establish traceability only through proof of "a direct chain of title from the original offering to the ultimate owner ..." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 117–18 (S.D.N.Y. 2004). Plaintiffs allege that since both the IPO and the SPO share the same defect, they can bring claims against both offerings, "provided that they can trace their stock to one of the two offerings." *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 557 (D.Colo.1998).[8] However, despite the difficulty in proving traceability, "plaintiffs are not entitled to a presumption of traceability." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 118. Here, neither Mr. Ho nor Mr. Jin purchased pursuant to the SPO because they did not purchase on the date of the SPO. (*See* Certificate attached to the Corrected Amended Complaint). And although Plaintiffs allege that they purchased pursuant to and/or *traceable to* both the IPO and the SPO, they do not offer any facts to support their conclusory statements that their shares can be traced to the SPO. Since Plaintiffs have failed to sufficiently set forth a direct line of traceability between their injury and the SPO, relying on the SPO alone would be insufficient to support the claim. However, the claims as they relate to the IPO are sufficiently alleged and therefore the motion to dismiss the § 11 claim is DENIED.

## STANDARD OF REVIEW ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

The task of the Court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks and citation omitted). The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the Plaintiff's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). In deciding a motion to dismiss, the Court is not limited to the face of the complaint. The Court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it

8. Plaintiffs rely on *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 556–57 (D.Colo. 1998) for the assertion that tracing is a merits issue and thus, is inappropriate to decide on this motion. However, *Schwartz* deemed it inappropriate to decide traceability because the court was deciding whether to certify the class. In addition, *Schwartz* was decided prior to the establishment of the plausibility standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000)).

## STANDARD OF REVIEW–SECTION 11

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides for civil liability when "any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." There are five (5) enumerated parties subject to liability under the provision: signatories of the registration statement, directors or partners at the time of the filing of the statement at issue, persons named in the statement as being or about to become a director or partner, preparers or certifiers of the statement (or any report used in connection with the statement), and underwriters of the security. Section 11, Securities Act of 1933, 15 U.S.C. § 77k(a)(1)-(5). "'To prevail on a § 11[ ] claim, a plaintiff must show that the relevant communication either misstated or omitted a material fact.'" *Fait v. Regions Financial Corp.*, 655 F.3d 105, 109 (2d Cir.2011) (quoting *Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir.2010)). Under § 11, a misrepresentation of fact is material if "an investor would attach importance to it in making an investment decision." *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004 *9 (S.D.N.Y.1999). An omission is deemed to be material "if there is a substantial likelihood that the 'disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available.'" *Id.*, at *9 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In the Second Circuit, if a § 11 claim sounds in fraud, the heightened pleading standard of Fed. R.Civ.P. 9(b) applies, and the Plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (internal citations omitted); *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004).

## STANDARD OF REVIEW–SECTION 15

Section 15 of the Securities Act of 1933 establishes control person liability for "every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under section[ ] 77k." 15 U.S.C. § 77o. In order to establish liability under Section 15, Plaintiffs must show a "'primary violation' of [Section] 11 and control of the primary violator by defendants." *In re Lehman Bros. Mortgage–Backed Securities Litigation*, 650 F.3d 167, 185 (2d Cir.2011) (quoting *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206–07 (2d Cir.2009)). Section 15 claims must satisfy the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, not the heightened pleading requirements of Rule 9(b) or the PSLRA as "fraud and scienter are not necessary elements of [a section 15] claim." *In re Vivendi Universal, S.A.*, 381 F.Supp.2d 158, 187 (S.D.N.Y.2003); *See also In re IPO Securities Litigation*, 241 F.Supp.2d 281 (S.D.N.Y.2003); *In re Global Crossing, Ltd. Securities Litigation*, No. 02 Civ. 910(GEL), 2005 WL 1907005 (S.D.N.Y. August 8, 2005).

## STANDARD OF REVIEW–SECTION 10(B) AND RULE 10B–5

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in

connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Under SEC Rule 10b–5(b) it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b–5. In order to state a claim under Section 10(b) and Rule 10b–5, a Plaintiff must assert: (1) that the Defendant made a material misrepresentation or omission; (ii) with scienter; (iii) in connection with the purchase or sale of securities; (iv) that the plaintiff relied on the material misrepresentation (or omission); (v) an economic loss sustained by the plaintiff; and (vi) a causal connection between the material misrepresentation (or omission) and the plaintiff's loss. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–43, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Stoneridge Inv. Partners, L.L.C. v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000).

█ Under Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), when fraud is alleged, a plaintiff must also "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007); *see also* 15 U.S.C. § 78u–4(b)(1). These heightened pleading requirements must be met in order for the Complaint to survive a motion to dismiss. The PSLRA also requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

## STANDARD OF REVIEW– SECTION 20(A)

█ Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act]" ... "to the same extent as such controlled person" ... "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996).

## DEFENDANTS' MOTION TO STRIKE

█ Under Federal Rule of Civil Procedure 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.P. 12(f). However, "motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute," *Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.,* 288 F.Supp.2d 473, 481 (S.D.N.Y. 2003) (quoting *Kounitz v. Slaatten,* 901 F.Supp. 650, 658 (S.D.N.Y.1995)) (citation omitted).

█ Defendants allege that the Muddy Waters Report should be stricken because it is unreliable and unsubstantiated, and thus, has no bearing on the issue in dispute. (DGW's Mem. Supp. Mot. to Dismiss, 14–16). To support their motion,

Plaintiffs rely on Second Circuit decisions that struck allegations of unadjudicated "facts" taken from a complaint in a separate proceeding. *See generally Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892–94 (2d Cir.1976) (striking references to an SEC complaint from plaintiff's complaint against defendants).

Even though Defendants question the reliability of an anonymously written report, such as the Muddy Waters Report, an analyst's report "does not implicate the same skepticism as a 'traditional' anonymous source." *In re China Educ. Alliance, Inc. Sec. Litig.*, CV 10–9239 CAS JCX, 2011 WL 4978483 at *4 (C.D.Cal. Oct. 11, 2011). The rationale is that a ruling that finds financial analysts' reports as suspect would mean that a plaintiff would never be able to rely on an unsigned analyst's report to support a securities fraud allegation. *Id.* Even though Defendants claim that Muddy Waters is a biased party, and that it openly admits the possible inaccuracy of the Report, "the reliability of the report is a question of fact." *In re China Education Alliance, Inc. Sec. Litig.*, 2011 WL 4978483 (C.D.Cal. Oct. 11, 2011) (citing *Henning v. Orient Paper Inc.*, 2011 WL 2909322 *4, *8 (C.D.Cal. July 20, 2011)). The Muddy Waters report cannot be said to "clearly ha[ve] no bearing on the issue in dispute." *Global View Ltd.*, 288 F.Supp.2d at 481 (quoting *Kounitz*, 901 F.Supp. at 658).

Therefore, the Defendants' motion to strike the Muddy Waters report is DENIED.

## THE STATUTE OF LIMITATIONS

 The Underwriter Defendants move to dismiss Plaintiff's § 11 claims as time-barred. Claims brought under § 11 of the Securities Act of 1933 are governed by a one-year statute of limitations prescribed by Section 13 of the Act. 15 U.S.C. § 77m (1988). The statute begins to run when a plaintiff has actual notice of the statutory violation or when the plaintiff is placed on inquiry notice of the statutory violation. *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir.1993). A plaintiff is placed on inquiry notice when "a reasonably diligent plaintiff would have discover[ed] the facts constituting the violation." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S.Ct. 1784, 1798, 176 L.Ed.2d 582 (2010) (internal quotation marks omitted). A reasonably diligent plaintiff discovers facts constituting the violation only when the plaintiff has sufficient information "to adequately plead th[ose] fact[s] and survive a motion to dismiss." *City of Pontiac General Employees' Retirement System.* 637 F.3d 169, 175 (2d Cir.2011) (citing *Merck*, 130 S.Ct at 1796). Dismissal should only be granted "on the basis of inquiry notice when the complaint and 'uncontroverted evidence clearly' support such a finding." *In re Morgan Stanley Mortg. Pass–Through Certificates Litig.*, 810 F.Supp.2d 650, 663 (S.D.N.Y.2011) (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 167–68 (2d Cir.2005)). *See Staehr v. The Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 412 (2d Cir.2008) (ruling that the issue of inquiry notice is "often inappropriate for resolution on a motion to dismiss"). *See, e.g., Menowitz*, 991 F.2d at 42 (holding that inquiry notice was properly resolved as a matter of law, where the SEC documents themselves provided sufficient notice to plaintiffs of their claims because the documents disclosed numerous lawsuits and investigations against the company directly related to the claims plaintiffs brought against the company).

 Plaintiff must plead compliance with the statute of limitations outlined in § 13 of the Securities Act because it is a substantive element of a § 11 claim. *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 343 (S.D.N.Y.1986) (citing

*Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 291 (W.D.N.Y. 1977)). In order for the Plaintiff to comply with the statute of limitations "the complaint must set forth: (1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery." *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 662 (S.D.N.Y.1987) (quoting *Krome v. Merrill Lynch & Co.,* 637 F.Supp. 910, 914 (S.D.N.Y.1986)).

■ Since § 11 is violated by any misstatement or omission of material fact in a registration statement, Plaintiffs would be placed on inquiry notice at the moment a reasonably diligent plaintiff would have discovered sufficient facts to plead the existence of the misstatement or omission of material fact. *City of Pontiac General Employees' Retirement,* 637 F.3d at 175.

■ Here, the Underwriter Defendants assert that Plaintiffs had inquiry notice at the moment the IPO Documents were released because "red flags" in the IPO registration statements would have led a reasonably diligent plaintiff to discover facts sufficient to plead a § 11 claim.[9] (Underwriter Defs.' Mem. in Supp. of Mot. to Dismiss 4–5).[10] However, these red flags would not have indisputably led a reasonable investor to investigate, let alone discover facts sufficient to plead a complaint at the time DGW filed the IPO Documents. At the moment that DGW released the IPO Documents. Plaintiffs had no reason to believe that the financial figures were incorrect or grossly misstated. DGW's financial figures were independently audited by GT–HK, which could reasonably assuage any concerns that investors might have had. Further, it is unreasonable to expect investors to independently verify an international corporations' financial figures after an accounting firm has independently completed an audit, and has garnered support from several corporate underwriters.

■ Defendant Underwriters also argue that the IPO Documents' disclaimers served as sufficient notice to Plaintiff that the numbers were misstated. (*See* IPO Prospectus 25–26). However, the disclaimers only provide general statements of past, current, and future problems that the company faced, and they do not clearly warn Plaintiffs of financial misstatements. In *Menowitz,* the court found that the company's disclosure of more than 80 lawsuits, as well as criminal and civil investigations against the company and its officers, was sufficient to place the plaintiffs on inquiry notice. Here, DGW did not disclose its alleged shortfalls and miscalculations with the same level of particularity found in *Menowitz.* The IPO Documents contained disclaimers about financial accounting difficulties that DGW was dealing with as it sought compliance with U.S. law. For example, DGW identified several weaknesses in its IPO Prospectus:

9. Underwriter Defendants make an identical argument for the Section 11 claim related to material misstatements in the SPO Documents. Because Underwriter Defendants were not added as parties until Plaintiffs amended their complaint on June 15, 2011, claims based on the SPO Documents against any added parties would also be time barred if Plaintiffs were placed on inquiry notice by the registration documents themselves. (Underwriter Defs.' Mem. in Support of Mot. to Dismiss, 4–5).

10. Each defendant incorporated the Underwriter Defendants' statute of limitations argument in its own motion to dismiss papers. Thus, this analysis extends to every argument in support of dismissing the section 11 claims as time-barred.

Previously identified material weaknesses mainly related to: (1) an inability to timely identify disputed balances or unpaid aged balances of revenue and accounts receivable; (2) differences and errors in the recording of cost of revenue and inventory; (3) a lack of effective controls over the financial reporting process due to an insufficient complement of personnel with an appropriate level of accounting knowledge, experience and training in the application of U.S. GAAP commensurate with our financial reporting requirements . . .

(IPO Prospectus 25–26). Although the disclaimers do detail some problems related to Plaintiffs' claims, they are not so particular as to warrant a resolution of the inquiry notice issue as a matter of law. *See Lentell,* 396 F.3d at 167–68. Further, just a few lines underneath the alleged warnings, DGW dismisses many of those deficiencies by pointing out remedial actions that the company is taking.[11] In light of DGW's reassurances, the Underwriter Defendants' assertion that Plaintiffs had sufficient warnings of DGW's misstatements is unpersuasive. By reassuring investors in the same breath that it warned investors, DGWs disclosures did not place Plaintiffs on inquiry notice.

Plaintiffs have sufficiently pled compliance with the statute of limitations requirement of § 13. Plaintiffs allege in their complaint that they did not discover or have reason to know of any fraudulent statements until September 13, 2010.

(CAC ¶¶ 16, 19; Pls.' Mem. in Opp'n to Mot. to Dismiss 8–9, n. 16; Tr. of Oral Arg., April 4, 2012 at 151–53, 158–59). Because DGW had consistently disclosed positive financial data and company growth, it is plausible that investors would not have reasonably known of financial indiscretions until DYP's troubles came to light, or until DGW refused to submit documents during the Skadden review and several of its board members resigned in protest. It is reasonable on these facts that investors were not on inquiry notice of the alleged misrepresentations until September 13, 2010, when DYP's accounting issues were made public. *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003). Since Plaintiffs filed their complaint approximately one week after September 13, 2010, and amended their complaint to include the Underwriter Defendants within one year, Plaintiffs have sufficiently pled within the one-year statute of limitations for all claims based on the IPO Documents. The statute of limitations argument fails, and the Underwriter Defendants' motion to dismiss is DENIED.

## DUOYUAN GLOBAL WATER, INC., GUO, YU, AND PARK'S MOTION TO DISMISS

### § 11 Claims Against DGW, Guo, Yu, and Park

Plaintiffs allege that DGW is liable under § 11 of the Securities Act based on

---

**11.** "To remedy the differences and errors in the recording of cost of revenue and inventory, we have assigned a raw material code to each individual raw material part to correctly identify and value our inventory. We also hired Stephen C. Park . . . We have also established an archive room in our corporate offices . . . To remedy the previously identified significant deficiencies, we now classify our expenses to conform to U.S. GAAP . . . We are also in the process of, among other things: (1) hiring additional qualified accounting personnel with U.S. GAAP accounting knowledge; (2) establishing an internal audit function; and (3) supplementing and documenting our accounting policies and procedures for use by our personnel . . . We are also interviewing outside consultants to assist us . . . We will continue to implement measures to remedy these material weaknesses and deficiencies in order to meet the deadline imposed by SOX 404." (IPO Prospectus 25–26).

four statements made in the IPO and SPO registration documents: (1) statements regarding the company's financial performance (¶¶ 77, 90); (2) representations of the number of distributors in China (¶¶ 81, 94); (3) statements regarding the number of DGW employees (¶¶ 82, 95); and (4) assertions in the IPO and SPO documents stating that DGW's financial statements were prepared in accordance with Generally Accepted Accounting Principles (GAAP) (¶¶ 117–126).

In the CAC, Plaintiffs explicitly aver that each of the § 11 claims (all of which are contained in Count 1) are "predicated on the negligence of each Defendant in conducting DGW's IPO and SPO pursuant to the Registration Statement" (CAC ¶ 70) and that the Plaintiffs "do not allege that Defendants engaged in intentional or reckless conduct or that they acted with scienter or fraudulent intent." (*Id.*) Based on this wording, Plaintiffs assert the minimal pleading standards of Rule 8(a)(2) which apply to the § 11 claims, as opposed to the heightened pleading standards of Rule 9(b). However, simply disclaiming fraud does not preclude the applicability of the heightened pleading requirements of Rule 9(b). In the Second Circuit, when "the wording and imputations of the complaint are classically associated with fraud," Plaintiffs must meet the pleading standard of Rule 9(b), including satisfying the requirement "that the pleading 'explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

■ Here, each of the statements providing a basis for the § 11 claims sound in fraud: that the Registration Statement "contained untrue statements and omissions," that DGW materially "overstated" revenue figures, the number of distributors, the number of employees, etc. Even more indicative that the § 11 claims are not based in negligence, but rather fraud, is the fact that Plaintiffs do not " 'specify[ ] the allegations that would support a negligence cause of action.' " *Rombach*, 355 F.3d at 172 (quoting *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 690–91 (S.D.N.Y.2000)). Plaintiffs' § 11 claims must be pled in compliance with the heightened pleading requirements of Rule 9(b). The sufficiency of each of these statements to do so is addressed in turn below:

*Financial Reports–Discrepancies Between SAIC and SEC Filings*

■ Plaintiffs allege that discrepancies between filings made with the local office of the SAIC in China for two DGW subsidiaries (Duoyuan Langfang and Duoyuan Beijing) for the years 2006 to 2008 and the financial statements for those same years included in the SEC F–1 Forms in the IPO and SPO documents, demonstrate that the SEC filings are false. (CAC ¶¶ 77–78, 90–91). Plaintiffs allege, for example, that "DGW told the SAIC that Duoyuan Langfang generated revenues of 0, 3.2 million and 1.9 million RMB for the years 2006, 2007, and 2008, but told the SEC that Duoyuan Langfang generated 206.2 million RMB, 272.9 million and 424.4 million RMB in revenues for the same years." Pl.'s Mem. in Opp'n. to Mot. to Dismiss, 13, n. 12. (citing CAC ¶ 77). Other alleged discrepancies are even more glaring. For example, according to Plaintiffs DGW reported negative operating incomes to the SAIC: –621,545 RMB, –1.8 million RMB, and –1.9 million RMB for the years 2006, 2007, and 2008, yet reported to the SEC that operating income was positive 18.2 million RMB, 27.3 million RMB, and 96.2 million RMB for those same years. *Id.* Also striking is the allegation that "Duoyuan Beijing and Duoyuan Langfang reported *net losses* to the SAIC all three years, [while] DGW report-

ed *net income* from 52.8 million RMB, 82.2 million RMB and 133.7 million RMB." *Id.* citing CAC ¶ 78. In addition to the disparate financial statements in the filings, Plaintiffs rely on the Muddy Waters report which claimed that it viewed a 2009 report of local SAIC filings and discovered that DGW figures for total revenues for all of 2009 were overstated, as further support that the company misrepresented financial information in the SEC filings.

Defendants respond that the Plaintiffs failed to put forth sufficient facts to support the conclusion that the SAIC and SEC reports are based on the same data. Defendants also maintain that the Plaintiffs are comparing the SAIC filings, for two DGW subsidiaries, to the SEC filings which are a reporting of DGW on a consolidated basis. This is significant, Defendants argue, because Plaintiffs fail to account for differences in stand-alone and consolidated reporting. Additionally, Defendants contend that differences in accounting principles between U.S. GAAP and Chinese GAAP could cause substantial discrepancies in reports such as those identified by Plaintiffs. Defendants argue that in any event, the discrepancies are just as consistent with the SEC filings being accurate and the SAIC filings being false, as they are with the opposite, and thus the allegation is insufficient to state a § 11 claim under *Twombly,* 550 U.S. at 554, 127 S.Ct. 1955.

Plaintiffs have asserted that DGW made two markedly different representations of the financial position of the DGW Langfang and Beijing subsidiaries in the SAIC reports and the SEC filings. Although the SEC filings were of DGW as a whole, Plaintiffs relied on the segment reporting of Duoyuan Langfang and Duoyuan Beijing in the IPO and SPO filings to compare them with each of the subsidiaries' filings with the SAIC. Thus, the comparison is substantively appropriate. Defendants'

argument that the differences can reasonably be attributed to differences in U.S. GAAP and Chinese GAAP is unpersuasive given the large margins of disparity between the figures reported in the two filings. Although Plaintiffs have not proven that the SEC filings were in fact false, the extreme discrepancies alleged in the financial reports, coupled with the logical inference that can be made regarding these figures, at this stage of the proceedings, sufficiently alleges that the statements made in the SEC filings are false. Defendants merely maintaining that the discrepancies are explainable is an insufficient reason to dismiss the CAC. Assuming that the SAIC filings are true, the CAC states sufficiently that the SEC filings are false. Based on the fact alleged that DGW had more negative disclosures in China and positive disclosures with the SEC, the reasonable conclusion is that there is a fraudulent motive to overstate the numbers yet no fraudulent motive to understate them. The discrepancies provide an adequate basis for Plaintiffs' § 11 claim.

*Number of Distributors in China*

Plaintiffs contend that the IPO and SPO documents repeatedly represent that DGW boasts a network of over 80 distributors throughout China, yet because the IPO documents fail to mention any distributor by name, and no one distributor was responsible for more than 3% of the company's sales in any given year, that statement must be false. Plaintiffs also point out that the company's website does not list a single distributor, and that DGW did not attach an example template of the distributor contract as an Exhibit to the company's Form F–1, as additional support of the statement's falsity. Lastly, Plaintiffs rely on Muddy Waters' April 4, 2011 report's assertion that "it was difficult for investigators to locate DGW distributors" and that "an investigator for

Muddy Waters was told that there was neither a sales office nor a distributor in Shanghai–China's most populous city." CAC ¶ 81(a)-(d).

These factual allegations, however, fail to explain why DGW's statement of the size of its distributor network is fraudulent. *Mills,* 12 F.3d at 1175. The fact that the company website did not include distributor names does not demonstrate that there was not a distributor network of 80. Neither does the company's failure to attach a template of its commonly used distributor contract, if there was such a contract, to the Form F–1. The facts derived from the Muddy Waters report are similarly unavailing. The difficulty to locate a distributor, and a statement that there was no distributor in Shanghai, are inadequate bases to conclude that the distributor statement was fraudulent. More importantly, the contents of the Muddy Waters report, published in 2011, cannot demonstrate, for purposes of § 11, that the representation of DGW's distributor network made in the registration statement was false in the 2006–2009 time periods when the IPO and SPO were conducted. *See Nelson v. Paramount Commc'ns, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1994) ("While events subsequent to the date of the registration statement may have been material, Section 11 by its own terms is limited to material [misrepresentations] in parts of registration statements that were misleading 'when such part[s] became effective.' ") (quoting *Hartford Fire Ins. v. Federated Dep't Stores,* 723 F.Supp. 976, 988 (S.D.N.Y.1989)). This statement, as pled in the CAC, is insufficient to state a claim for § 11 liability under Rule 9(b).

*Number of DGW Employees*

■ The CAC also alleges that DGW overstated the number of its employees at the time of the IPO, and SPO. CAC ¶ 82. Specifically, DGW represented that it had 796 employees as of December 31, 2006, 756 as of December 31, 2007, 927 as of December 31, 2008 and 1,166 employees as of December 31, 2009. Plaintiffs contend that Defendant Guo's statement in a March 23, 2011 investor conference call that there were "580 employees at DGW's sole manufacturing facility in Langfang," and the findings in the Muddy Waters report, demonstrate that those employee figures were false. *Id.* at ¶ 82(a)-(e).

Guo's full quote, from the transcript from the March 23, 2011 conference call,[12] regarding the total number of employees does not provide support for Plaintiffs' contention that the assertions in the registration statements are false. The transcript makes clear that Guo informed the investors on the call that " . . . we have altogether 580 workers working in our Langfang facility" but also that "the *combined* total of our employees stands at 1,246." *Exhibit 5 to DGW Mem. Supp. M. to Dismiss, Tr. p. 5.* The total of 1,246 employees that Guo reported on the call was not so far off from the numbers in the registration statement as to make the figure in the registration statement false. Further, a statement about the number of DGW employees in March of 2011 cannot serve to demonstrate the falsity of the figures reported in 2006–2009, when the registration statements were made. *See Nelson,* 872 F.Supp. at 1246 (S.D.N.Y. 1994).

The observations of the Duoyuan facilities in the April 2011 Muddy Waters re-

---

**12.** As the March 23, 2011 conference call was referenced throughout the Corrected Amended Complaint, it is incorporated into the complaint, and it is thus appropriate for this Court to consider the transcript of that call in deciding the motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

port, and Plaintiffs' investigator's findings at a site visit in April 2011 similarly fail to demonstrate the falsity of the 2006–2009 registration statements' account of the number of DGW employees. *Id.*

Thus, Plaintiffs have failed to explain why the IPO and SPO statement of the number of DGW employees was false, and this is an insufficient basis for a § 11 claim.

### Assertions That Financial Statements Were GAAP Compliant

■ Plaintiffs contend that the discrepancies between the financial information in the SAIC and SEC filings establish that the Company misstated DGW's true financial condition and improperly accounted for its revenues, operating income, and net income. Plaintiffs argue that this is strong evidence that the financial statements filed with the SEC did not comply with GAAP. CAC ¶ 119. The differences in the two filings are sufficient factual support for the claim that the Defendants are liable under § 11 for violations of GAAP in the documents filed in connection with the IPO and SPO.

Defendants' motion to dismiss the entire § 11 claim is DENIED.

### Section 15 Claims Against Officers Guo and Park

CEO Guo and CFO Park only challenged § 15 liability on the basis that a § 11 claim had not been alleged, thus conceding the issue of control. Having found an adequately pled § 11 claim based on the financial statements issued in connection with the IPO and SPO, the § 15 claims against Officers Guo and Park will remain.

### Section 10(b) Claims Against DGW, Guo and Park

Plaintiffs allege § 10(b) claims under the Exchange Act against DGW based on the same four types of statements underlying the § 11 claims, made both in the registra-

tion documents and various public announcements. These are misstatements of: DGW's financial performance, the number of distributors in China, the number of DGW employees, and misrepresentations in the IPO and SPO registration documents asserting that the company's financial statements were prepared in accordance with GAAP. Additionally, Plaintiffs assert § 10(b) claims based on three other statements made by either Guo or Park: (1) a statement made by Guo on a November 17, 2010 conference call asserting that DGW had operated at full capacity at the beginning of 2010 CAC ¶¶ 219–220; (2) Defendant Guo stating that DGW was cooperating with its Audit Committee, during both the November 17, 2010 conference call and a March 23, 2011 conference call *Id.* at ¶¶ 213, 216, 229; and (3) a statement made by Defendant Park on an August 18, 2010 conference call stating that DGW had been operating at cash-flow positive and would "produce positive cash flows from operating activities in the next two quarters." *Id.* at ¶ 208. Under Fed. R.Civ.P. 9(b) and the PSLRA, Plaintiffs must explain why the statements were fraudulent. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000). The PSLRA also requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

### Statements Regarding the Number of DGW Distributors

■ In addition to the statements underlying the § 11 claim, Plaintiffs rely on a statement made by Defendant Park on a May 12, 2010 conference call in which he stated that DGW had 82 distributors in China as a basis for a § 10(b) claim, claiming Park misrepresented the size of DGW's distributor network. For the same reasons previously outlined, Plaintiffs have not pled sufficient facts to explain why the

distributor network was not as vast as represented, and therefore why the statements were false, as required under § 10(b). Thus, Plaintiff's § 10(b) claim based on the alleged misrepresentation of the DGW distributor network must fail.

*Statement Regarding the Number of DGW Employees*

Plaintiffs' § 10(b) claim based on the number of DGW employees is based on the same arguments as their § 11 claim. The statement being an inadequate factual basis under § 11, the same is true of the § 10(b) claim.

*Statement of Capacity*

■ Plaintiff's allege that Defendant Guo's statement that DGW operated at full capacity in "early 2010" was false because (1) the SAIC filings for Duoyuan Langfang and Duoyuan Beijing report annual revenue of less than $ 1 million for 2010, and (2) observations in the April 2011 Muddy Waters report uncovered that, during an 80 hour period of observation of the Langfang facility, investigators counted fewer employees entering than were reported by the company, the facility did not receive any shipments nor make any shipments, and there were no lights on despite DGW's statements that there was a night shift. CAC ¶ 220(a)-(b). These facts fail to explain how Guo's statements were false. First, the fact that the reported annual revenue in the SAIC filings in 2010 were less than $1 million does not reasonably lead to the conclusion that the facilities must not have been operating at full capacity in early 2010. Plaintiffs fail to plead any facts supporting such a conclusion. As for the Muddy Waters observations, as the report was based on observations between January and April 2011, it does not provide support for the allegation that Guo's November 17, 2010 statement that the company "operated at maximum capacity at the beginning of [the year]" was false. Thus, Plaintiffs cannot proceed with a § 10(b) claim on the basis of this statement.

*Statements Regarding DGW's Cooperation with the Audit*

■ Plaintiffs contend that Defendant Guo's statement in the November 17, 2010 conference call with investors that DGW was "fully cooperating with Skadden and [would] continue to do so" was false and materially misleading. CAC ¶ 212–13. Plaintiffs assert that the resignation letter of the four independent directors, dated April 20, 2011, wherein the directors gave an account of the ways in which DGW management, as they describe it, "hampered" the progress of the Audit between September 2010 and the date of the letter, in addition to Skadden's resignation after seven months of auditing, without publishing a report, demonstrates the falsity of Guo's statement. CAC ¶ 217. Defendants maintain that Guo's statement was merely one of his opinion, and thus only actionable under § 10(b) if Plaintiffs "allege with particularity that [Guo] did not sincerely believe the opinion [he] purported to hold." *Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 154 (S.D.N.Y.2004). Plaintiffs have alleged facts with particularity. The CAC recites the resigned directors' detailed accounts of management's non-cooperation with the audit from the beginning of the endeavor and the way in which "each time management promised future cooperation; however, each time when the review team recommenced its work, full cooperation was not forthcoming and new issues would arise." CAC ¶ 217. Additionally, Plaintiffs allege that just one day after the resignation of the four independent directors, Skadden withdrew as special counsel to the Audit Committee and the Special Investigation Committee. *Id.* ¶ 28. Plaintiffs have sufficiently pled enough facts to support the allegation that Guo did not sincerely believe that DGW

was fully cooperating in November of 2010, nor that it would be cooperating with the audit in the future. Thus, Plaintiffs have alleged facts that demonstrate that Guo's statement, even if fairly characterized as opinion, was both objectively and subjectively false. *Podany*, 318 F.Supp.2d at 154. Plaintiffs have sufficiently pled a § 10(b) claim based on Guo's statement assuring cooperation with the audit.[13]

*Statements Regarding 2010 Results*

■ Plaintiffs further allege that DGW made false statements on November 17, 2010 in its report of the Third Quarter 2010 results and corresponding conference call, as well as in the March 22, 2011 release of the Fourth Quarter 2010 results. However, Plaintiffs do not provide factual support for this contention. Plaintiffs rely on the Auriga investigation in 2010, which allegedly uncovered that DGW's utilization rate at its manufacturing facilities was at only "about 50%," CAC ¶ 105, Muddy Waters' 2011 investigation which revealed that fewer employees worked at the Langfang facility than DGW reported, and Plaintiffs' own investigation through which it discov-

ered that the financial figures for 2006–2009 were overstated based on the SAIC filings. None of these allegations, accepted as true, have any bearing on the truth or falsity of the 2010 financial figures. Unlike with the financial statements made from 2006–2009, Plaintiffs provide no SAIC filing or other report of financial figures to contradict the Third Quarter and Fourth Quarter results for 2010. Plaintiffs' assertion that, given the inflated figures for 2006–2009, "the need to portray growth in 2010 caused DGW and the Management Defendants to report false year-over-year figures" is merely conclusory. CAC ¶ 225(a). The extent of DGW's operations and the distributor network do not explain why the 2010 figures were false when reported. Without factual support for the assertion that the 2010 financial figures were false, Plaintiffs cannot proceed with a § 10(b) claim on this basis.

*Defendant Park's Statement Predicting Continued Operations at Cash Flow Positive*

Plaintiffs claim that the Defendants are liable under § 10(b) based on Park's Au-

---

**13.** Plaintiffs allege that Park may be held liable for the allegedly false statements made by Guo. Plaintiffs offer two theories for Park's liability. First, that Park is liable under the group-pleading doctrine. Second, that Park is liable for "fail[ing] to correct or clarify the false and misleading statements made by Guo." (CAC ¶ 221; *see also id.* ¶¶ 216, 230). Both arguments fail. Plaintiffs do not attempt to overcome the well-established rule that the group-pleading doctrine does not apply to oral statements. *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020(CM), 2011 WL 1197659, at *9 (S.D.N.Y. Mar. 25, 2011) (citing *In re Vivendi Universal S.A.*, 381 F.Supp.2d 158, 192 (S.D.N.Y.2003); *Elliott Assoc., L.P. v. Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000)). As for Park's failure to correct Guo, Plaintiffs primarily rely on *Freudenberg v. E*Trade Financial Corp.*, 712 F.Supp.2d 171 (S.D.N.Y.2010), in which the court concluded that a corporate executive is

liable "for a material omission in failing to correct [the other executives'] statements . . ." *Id.* at 195. (quoting *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 527, 543 (S.D.Ohio 2000), *and* citing *Barrie v. Intervoice–Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005)). Holding Park liable for Guo's alleged false statements based on a failure to correct, or omission, would be in tension with the Supreme Court's recent decision. In *Janus Capital Group. Inc. v. First Derivative Traders*, — U.S. —, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), the Supreme Court ruled that only the person who "makes" the misstatement is ultimately liable for a section 10(b) violation. *Id.* at 2302. Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well. Therefore, Guo would be the only person liable for her oral misstatements and any omissions of material fact that accompanied those misstatements.

gust 18, 2010 statements in a conference call with investors that (1) "for the first half of 2010, [DGW had] generated RMB87.3 million of operating cash flows" and (2) that "it is expected that [DGW would] be able to produce positive cash flows from operating activities in the next two quarters." DGW's Mem. in Supp. of Mot. to Dismiss, 40; 8/18/10 Conf. Call Tr. Ex. 7, p. 3, 6; CAC ¶ 208. DGW and Park allege that these statements are protected by the PSLRA's Safe Harbor Doctrine.[14]

Plaintiffs claim that Park's statements were about both future and present earnings, which would cause the statement to fall outside of the Safe Harbor Doctrine's protection of forward-looking statements. In support of their assertion, Plaintiffs cite several cases that deny Safe Harbor coverage when a statement relates to a company's *present* financial conditions. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir.2008); *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir.2003).

█ These are two separate statements made in the same conference call. As for the first statement, Plaintiff's have failed to sufficiently allege facts demonstrating why Park's assertion of the company's cash flows for the first half of 2010 is false. As previously discussed, Plaintiff's reliance solely on the discrepancies between the SAIC and SEC filings for the

years 2006–2009 does not establish anything about the truth or falsity of any of the company's statements of financial position during 2010.

█ As for the second statement, it is clear that Park makes no reference to present earnings. In the statement quoted, Park was answering a question about what is to be expected in the *next* two quarters, not what was occurring at the present time. In *Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir.2010), the Second Circuit held that the use of the word "expected" in conjunction with future quarterly financial data "fits comfortably within [the Safe Harbor statute.]" *Id.* at 767.

Both of Park's statements were accompanied by cautionary statements that forward looking statements would be made in the call, and that they were subject to change without being updated. Def.'s Mem. in Supp. of Mot. to Dismiss, 8/18/10 Conf. Call Tr. Ex. 7, p. 1. As the second statement falls within the Safe Harbor provision, Plaintiffs must allege that Park made the statement with actual knowledge of its falsity. 15 U.S.C. § 78u–5(c)(1)(B)(i). In support of this contention, Plaintiffs again point to the disparate filings with the SAIC and SEC for the years 2006–2009, and argue that Park, as DGW's Chief Financial Officer, was aware that his projections were false. However, the discrepancies in filings made in 2006–2009 do not

---

14. The Safe Harbor Doctrine states, in relevant parts:

1) In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; ...

15 U.S.C. § 78u–5.

establish that the outcomes in 2010 were false, nor that Park actually knew that his projection of the coming two quarters was false. Therefore, Plaintiffs cannot move forward with a § 10(b) claim based on either of Park's oral statements made during the conference call on August 18, 2010.[15]

*Statements Regarding 2006–2009 Results*

Plaintiffs allege that the false statements made in the IPO and SPO registration statements and various press releases reporting 2009 results provide a basis for the Defendants' liability under § 10(b). The Corrected Amended Complaint contends that the discrepancies between the SAIC and SEC filings during 2009 establish the falsity of each of those statements. As determined in the § 11 analysis, Plaintiffs have sufficiently pled the falsity of the statements for a § 10(b) claim. Defendants, however, contend that Plaintiffs have failed to demonstrate that these statements were made with the requisite scienter.

*Scienter of DGW, Park, and Guo*

 Under the PSLRA, in order to plead scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.2009). Scienter may be established by showing either: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 586 (S.D.N.Y.2011) (internal citations omitted). When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be corre-

spondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001) (internal citations omitted). Although there is no all-encompassing list of the allegations that would be sufficient to plead recklessness, examples that suffice include defendant "knew facts or had access to information suggesting that their public statements were not accurate ... [or] ... failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. When determining whether Plaintiffs alleged a strong inference of scienter, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis in the original).

 Plaintiffs rely on several facts to raise a strong inference that Park and Guo acted with scienter. First, Plaintiffs allege that Park and Guo, as CFO and CEO, respectively, knew or should have known that the U.S. reported revenues, operating income, and net income were much greater than those reported in the SAIC filings. CAC ¶¶ 72–96, 175–76. The alleged violations of GAAP in particular, are also strong evidence that Park and Guo, as executives of DGW, at the very least should have known of the misstatements. Here, Plaintiffs allege significant discrepancies between SAIC and SEC filings, sometimes the SEC filings reported revenue and net income one-hundred times greater than what was reported in the SAIC filings. CAC ¶¶ 90–91. Defendants attempt to rebut this inference of scienter by asserting that Plaintiffs have not alleged that Park had access to the SAIC documents, and that Park was not an ex-

---

**15.** Guo contends he is not liable for Park's statements, as Park's statements do not provide a basis for a § 10b claim, it is unnecessary to address Guo's argument.

pert in Chinese financial forms. (Park's Mem. in Supp. of Mot. to Dismiss, 7–11). Park and Guo were CFO and CEO of a multinational corporation, and as such, were required to be aware of the Company's financials. "Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 490 (S.D.N.Y.2004). Plaintiffs allege with particularity that Park worked with external auditors, CAC ¶ 59, had detailed knowledge of DGW's operations, *Id.* ¶ 146 n. 14, and frequently spoke to analysts about all aspects of DGW's business, *Id.* ¶ 186, 191. Plaintiffs further allege that as CEO of DGW, Guo executed a number of SEC documents on behalf of DGW. *Id.* ¶ 41.

In addition to Park's and Guo's executive positions and the large discrepancies between the SEC and the SAIC figures, Plaintiffs allege that the Muddy Waters report adds to a strong inference of scienter. The Muddy Waters report, although not dispositive, may be relied upon as evidence of Park's and Guo's scienter at this stage in the proceedings. Park's and Guo's optimistic forecasts for DGW were in complete opposition to the alleged facts that were uncovered about DGW by Muddy Waters, as well as Plaintiffs' private investigators. CAC ¶¶ 25, 82, 220, 241.

Further, Park's subsequent resignation to "pursue another professional opportunity" adds to the inference of scienter. CAC ¶ 115. Park resigned approximately at the same time that DYP announced accounting difficulties and Auriga released its report about DGW. Of course, Park's resignation by itself is insufficient to support an allegation of scienter because "there are any

number of reasons that an executive might resign ..." *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 446 (S.D.N.Y.2005). However, when considered in conjunction with the rest of Plaintiffs' allegations, a strong inference of scienter has been stated with particularity. *See In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 394 n. 176 (S.D.N.Y.2007).

In light of all the facts discussed, Plaintiffs have alleged sufficient facts to give rise to a strong inference of Park's and Guo's scienter. As such, Park's and Guo's state of mind may be imputed onto DGW. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 543 (S.D.N.Y.2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation." (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.2008))). DGW's motion to dismiss the § 10(b) claim is DENIED.

*Section 20(a) Claims Against the Individual Defendants*

Plaintiffs also allege § 20(a) control person liability against the Individual Defendants, for violation of § 10(b) of the Exchange Act. As the Defendants only challenged the sufficiency of Plaintiff's claim of an underlying primary violation of § 10(b), having found a sufficient basis for the § 10(b) claim, Defendants' motion to dismiss the § 20(a) control person liability claim is DENIED.

**GRANT THORNTON INTERNATIONAL'S MOTION TO DISMISS**

Plaintiffs assert two claims against Defendant GTIL, one under § 10(b) of the Securities Exchange Act and Rule 10(b)(5), and one under § 11 of the Securities Act. GTIL seeks dismissal of the § 10(b) claim on the basis that it did not make the alleged misstatements in the registration

statements, rather GT–Hong Kong, a member firm of GTIL, served as DGW's auditor. GTIL seeks dismissal of the § 11 claim arguing that it is not a liable party under the statute.

### GTIL's Liability for § 10(b) Violations

In *Janus Capital Group, Inc. v. First Derivative Traders,* the Supreme Court limited liability for § 10(b) violations to parties that actually "make" misstatements of material fact and explained that the party who "makes" the misstatement is "the person or entity with ultimate authority over the [mis]statement, including its content and whether and how to communicate it." (—— U.S. ——, 131 S.Ct. 2296, 2302, 180 L.Ed.2d 166 (2011)). A party does not have ultimate authority over a misstatement just because it shares close business ties or a similar corporate name with the party who made the misstatement. Further, those who aid or abet in making a misstatement are not liable in a private suit for the misstatement under Rule 10b–5, even if the aiding party has the power to influence the party who does in fact make the misstatement, *see Janus Capital Group, Inc.,* 131 S.Ct. at 2304 (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)).

Taking the allegations in the CAC as true, Plaintiffs fail to allege a § 10(b) claim against GTIL. Plaintiff alleges that both the GT–China and GT–Hong Kong offices had worked with DGW as auditors, but that GTI[L] is currently DGW's outside auditor "through its member firm ... GT–China" and that GT–Hong Kong acted as an agent of GTI[L] and thus GTIL is liable for the alleged financial misstatements. CAC ¶¶ 58, 59. Plaintiffs' § 10(b) claim relies on two allegations: (1) GTIL had the power to sanction its member firms if they did not follow GTIL's strict accounting standards and thus, had control over what information was released in the audits; and (2) the name "Grant Thornton," not Grant Thornton–Hong Kong appeared on the signature line of the registration statement audits. *See* Pls.' Mem. in Opp'n to Mot. to Dismiss, 5–6. However, neither allegation is sufficient to allege a § 10(b) claim against GTIL. GTIL's sanctioning power, although a sign of influence over member firms is not equivalent to making the statements in the audits. GTIL would not need the power to sanction its member firms if it had ultimate authority to approve or disapprove which audits its member firms' released. GTIL's sanctioning power is presumably used in reaction to its member firm's independent decisions to release audits. Nowhere in the CAC do Plaintiffs allege that GT–HK audits were approved by GTIL before releasing them, or that GTIL had any authority to prevent GT–HK from releasing audits. As pled, GT–HK had the final authority to decide whether an audit opinion was released to the public, "including its content and whether and how to communicate it." *Janus,* 131 S.Ct. at 2302. Contrary to Plaintiffs' reasoning, GTIL's sanctioning power is more consistent with mere influence rather than ultimate authority.

Plaintiffs also point to the Grant Thornton signature on the audit documents as further proof that GTIL made the alleged misstatements in those audits. Plaintiffs allege that the Grant Thornton name signifies that GTIL was the party to whom the statement is attributable and thus, ultimately liable. Further, according to Plaintiffs, "Hong Kong," written several lines below the signature in smaller font on the audit documents, referred to the place of the signing, not the name of the company that signed the audits. Pls.' Mem. in Opp'n to Mot. to Dismiss, 10, n. 11. However, Plaintiffs have not pled sufficient facts for the claim that the signature by

Grant Thornton is attributable to GTIL. The entities share a similar name, and it is inadequate to merely say that GTIL is liable because of that similarity. The fact that the two parties share a similar name is not indicative that both may be held liable for the alleged misstatements, even if GTIL and GT–HK share close business ties. *See Janus Capital Group, Inc.*, 131 S.Ct. 2296. Plaintiffs have not pled facts that support the claim that GTIL made the misstatements in the filings by showing that GTIL had ultimate authority over GT–HK's misstatements. *Id.* GTIL's alleged influence over GT–HK and other member firms falls short of adequately pleading liability under § 10(b).

*GTIL's Liability for § 11 violations*

Under § 11, certain enumerated parties may be held strictly liable for material misstatements or omissions in a corporation's registration statements. Because the statute provides for strict liability, Congress intended a narrowly constructed list of liable parties under the statute. *See In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 181 (2d Cir.2011) (citing H.R.Rep. No. 73–85, at 5 (1933)). One of the five narrowly constructed categories of liable defendants is "accountant[s] ... or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement ... or any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4).

 Plaintiffs first argue that GTIL is liable as an accountant because "the consents and certifications in the audit reports at issue were signed by and therefore attributed to *no entity other than* 'Grant Thornton,' the name that GT1 mandated

be used in 2001 to describe it." Pls.' Mem. in Opp'n to GITL Mot. to Dismiss, 11 (emphasis in original). However, reliance on the shared use of the brand name "Grant Thornton" does not sufficiently support a showing that Grant Thornton International LTD was the entity that audited DGW. Plaintiffs further argue that GT–Hong Kong issued the audits as an agent of GTIL. This argument is again unpersuasive as Plaintiffs have not pled facts in support of such an agency relationship over GT–Hong Kong's auditing of DGW. Moreover, expanding § 11 liability under a broad agency theory would undermine the Congressional intent that the list of parties liable under § 11 be strictly constructed. *See In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 181 (2d Cir.2011) (citing H.R.Rep. No. 73–85, at 5 (1933)).

Alternatively, Plaintiffs allege that GTIL may be liable as a "person whose profession gives authority to a statement made by him." Plaintiffs argue that GTIL's capacity as an expert-umbrella corporation would subject it to liability. Pls.' Mem. in Opp'n to Mot. to Dismiss, 11 (citing 15 U.S.C. § 77k(a)(4)). However, the statute plainly states that only a person "whose profession gives authority to a statement *made by him*" can be liable for misstatements. For the reasons previously discussed, Plaintiffs have failed to plead facts in support of the claim that GTIL was the party who made the alleged misstatements in the audit documents. GTIL's motion to dismiss the claims against it is GRANTED.

**INDIVIDUAL DIRECTORS' MOTIONS TO DISMISS**

*Section 15 Claims Against the Individual Directors*

Director Defendants assert that regardless of their liability under § 11, Plaintiffs

have failed to allege facts establishing that any of the Director Defendants controlled DGW. The individual Directors each move to dismiss the § 15 claim against them.

 To establish a prima facie case for control person liability under section 15 of the Securities Act, "plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 349 (S.D.N.Y.2004) (citing *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125(GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002)). Assuming an underlying § 11 violation, a director's control is defined as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2)[16]. The power to influence managerial decisions is not the same as "power to direct the management and policies of the primary violator." *In re Tronox, Inc. Sec. Litig.*, 769 F.Supp.2d 202, 208 (S.D.N.Y. 2011) (quoting *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F.Supp.2d 618, 645 (S.D.N.Y. 2004)). Rather, "*[a]ctual* control is essential to control person liability." *In re Blech Sec. Litig.*, 961 F.Supp. 569, 586 (S.D.N.Y.1997) (emphasis added). Although determining a person's liability as a control person is a "fact-intensive inqui-

ry[ ] [that] generally should not be resolved on a motion to dismiss," *In re Tronox*, 769 F.Supp.2d at 208, the "[s]tatus of defendants as directors, 'standing alone, is insufficient to establish their control.' " *Id.* (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919, at *7 (S.D.N.Y. Sept. 6, 2005)).

 Plaintiffs have not alleged any facts that could allow a jury to find that Directors Rooney, Firlotte, Holbert, Yu, or Larrea had control over DGW in their roles as directors. Even though resolution of control liability at the pleading stage is disfavored, Plaintiffs' conclusory allegations that these Director Defendants exercised control over DGW, CAC ¶ 50, without more, is insufficient. Plaintiffs merely recite the educational and professional experiences, and committee memberships of each of these Directors and conclude that these facts establish their ability to control DGW.[17] Since "[a]ctual control is essential to control person liability," *In re Blech Sec. Litig.*, 961 F.Supp. at 586, Plaintiffs fail to allege facts sufficient to support the claim that Directors Rooney, Firlotte, Holbert, and Yu possessed the requisite control over DGW under § 20(a).

 As for Defendant Larrea, Plaintiffs allege that she was a control person because of Larrea's unique position as both a director of DGW and as managing director of GEF, a minority shareholder in

---

**16.** Because the control person provisions under the 1933 and 1934 Acts are "roughly parallel," in the Second Circuit, the definition of "control" under § 15 and § 20(a) is the same and have been analyzed as such. *In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir.2011).

**17.** For example, Plaintiffs allege that Rooney held multiple advanced degrees and served on the Audit Committee during his tenure. CAC ¶ 46; that Firlotte was an expert in the water

industry and had many years of experience. CAC ¶ 49; that Holbert served on DGW's Audit, Compensation, and Nominating and Corporate Governance Committees. CAC ¶ 44, and that his experience in the industry and his knowledge of DGW's internal controls somehow gave him control of DGW; and that Director Yu's discussion of "both DGW's need to comply with environmental regulations and the expansion of DGW's business ..." rendered him a control person.

DGW. CAC ¶ 45. Plaintiffs claim that Larrea had *"veto power* over both extraordinary and day-to-day corporate transactions (including DGW's budgets)." (Pls.' Mem. in Opp'n to Mot. to Dismiss, 26–27) (citing Investors' Rights Agreement between DGW and GEF, ¶¶ 5.3(a)-(k), 5.4(c)(i)-(iii), dated February 2008) (emphasis in original). "However, Larrea's veto power ceased prior to the IPO, CAC ¶ 167, and thus provides no support for Plaintiffs" contention that Larrea was a control person during the § 11 violations alleged in this action. *See In re Global Crossing*, No. 02 Civ. 910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (ruling that a defendant must have "actual control over the *transaction in question"* in order to be held liable as a control person) (quoting *Ross v. Bolton*, No. 83 Civ. 8244, 1989 WL 80428 (S.D.N.Y.1989)) (emphasis added). Besides Larrea's veto power, Plaintiffs allege that Larrea's prior experience as a board member for other Chinese companies, as well as her position as chairman of the DGW's investigation committee is further evidence that Larrea controlled DGW's business operations. Pls.' Mem. in Opp'n to Mot. to Dismiss, 27. Larrea's past experience does not imply that she could direct the management or policies of DGW. The motions of the Director Defendants to dismiss the § 15 claims against them are GRANTED.

## GEF/GEEMF'S MOTION TO DISMISS

Defendants Global Environment Fund ("GEF") and GEEMF III Holdings MU ("GEEMF"), (together the "GEF Defendants"), move to dismiss the CAC pursuant to Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b). Defendant GEEMF III Holdings MU is a minority shareholder in DGW, and Defendant GEF is an affiliate of GEEMF III Holdings MU. Plaintiffs claim that the GEF Defendants violated § 11 and § 15 of the Securities Act, and, based on "misstatements or omissions in the IPO Offering Documents," and "misstatements in the SPO Offering Documents",[18] the GEF Defendants violated § 10(b) of the Exchange Act, and SEC Rule 10b–5. CAC ¶¶ 174–176.

*Respondeat Superior Theory of Liability*

▮ Plaintiffs allege that the GEF Defendants are liable under both § 11 and § 10b on a theory of respondeat superior, based on the actions of Director Larrea. Plaintiffs contend that Director Larrea acted as the GEF Defendants' agent when she executed the Investors' Rights Agreement in her capacity as a "Managing Director of GEF," and when she signed the two registration statements at issue, in her capacity as one of the Directors on DGW's Board. Plaintiffs argue that "in light of her dual position as both a DGW director and GEEMF's and GEF's agent under the IRA, Managing Director Larrea necessarily served GEF's and GEEMF's interests while serving on the Board of DGW ..." Pl.'s Mem. in Opp'n to GEF's Mot. to Dismiss, at 7–8. However, these facts alone are insufficient to make out a claim of liability under the doctrine of respondeat superior.

---

**18.** The GEF Defendants assert that Plaintiffs' § 10b claims against it extend only to the contents of the IPO documents. GEF's Mem. in Supp. of Mot. to Dismiss, 6 (citing to CAC ¶ 174). Plaintiffs argued in response that this limitation of the § 10b claim in one paragraph of the CAC was an error, as evidenced by a later paragraph in the CAC which alleges that the GEF Defendants' liability extended to "misstatements in and omissions from the SPO documents." Pl.'s Mem. in Opp'n to GEF Mot. to Dismiss, 13 n. 20, (citing CAC ¶ 176). The Court accepts Plaintiff's correction and construes its § 10b claim to extend to both the IPO and SPO documents.

What is critically missing is any allegation that the GEF Defendants controlled Larrea's actions as she served as a Director for DGW, or anything else indicating that her actions on the Board of DGW were somehow within the scope of her employment at GEF. Indeed, because directors have " 'fiduciary duties to act on behalf of the shareholders of [DGW] itself, not on behalf of the entities that appointed them ...' " the " 'mere fact that [Larrea] held [a] high position[ ][at] [GEF], and [was] appointed to the [DGW] board by [the GEF Defendants], cannot, standing alone, establish that [she] acted as [an] agent' " of the GEF Defendants. *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 2990646 at *5 (S.D.N.Y. Nov. 7, 2005) (quoting *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 1881514, at *3–*4, *9–*10 (S.D.N.Y. Aug. 5, 2005)). Plaintiff's reliance on the theory of respondeat superior as a basis for the GEF Defendants' liability under § 10(b) and § 11 is unpersuasive.

### § 11 Claim Against GEF Defendants

▮▮▮ The CAC alleges that the GEF Defendants violated § 11 of the Securities Act based on allegedly false statements made in DGW's IPO and SPO registration statements.[19] However, there are only five statutorily enumerated parties subject to liability under § 11: signatories, directors/partners, future directors/partners, preparers, and underwriters. *See,* 15 U.S.C. § 77k(a)(1)-(5). Plaintiffs do not allege anywhere in the CAC that the GEF Defendants fall within any of the five parties subject to § 11 liability. Instead, Plaintiffs merely assert that the GEF Defendants were first an "initial outside investor" in DGW that acquired "a 20% stake in the company." CAC ¶¶ 11, 61.

Because the Corrected Amended Complaint fails to allege any facts in support of the GEF Defendants qualifying as a statutorily liable party, Plaintiffs' § 11 claim against the GEF Defendants is DISMISSED.

### § 15 Claim Against GEF Defendants

▮▮▮ Plaintiffs allege the GEF Defendants are subject to control person liability under § 15 of the Securities Act by virtue of their control of DGW and of Director Larrea. CAC ¶ 169. In support of the claim that the GEF Defendants control DGW, Plaintiffs point to the GEF Defendants' appointment of Director Larrea to the DGW Board, their ability to inspect DGW's facilities and receive financial reports, and their right to approve certain of DGW's actions. To demonstrate that the GEF Defendants controlled Director Larrea, Plaintiffs rely on the fact that Director Larrea was the GEF Defendants' appointment to the DGW board.

These allegations are insufficient to plead a § 15 claim. The CAC fails to allege specific facts of either how GEF had "actual control" over DGW as opposed to merely having influence over it. *In re Blech,* 961 F.Supp. at 586. There is no factual support for the inference that the GEF defendants had day-to-day involvement in DGW simply because they were a minority shareholder. Moreover, Plaintiffs failed to sufficiently allege an underlying § 11 violation by Director Larrea. Thus, an argument in support of the GEF Defendants' § 15 liability based on the alleged underlying violation by Director Larrea fails. Additionally, Plaintiffs fail to plead facts supporting the claim that the GEF Defendants controlled Director Lar-

---

**19.** Plaintiffs also argue that the GEF Defendants are vicariously liable for alleged underlying violations of § 11 based on a theory of respondeat superior. Having found that Plaintiffs failed to establish respondeat superior liability, this Court will only address Plaintiffs' claim that the GEF Defendants are directly liable under § 11 of the Securities Act.

rea merely because she was appointed to the DGW board by them. As a Director, she owed fiduciary duties to DGW's shareholders, and absent any facts undermining the assumption that she acted in accordance with her duties, Plaintiffs have not made out a sufficient § 15 claim based on the GEF Defendants' appointing her to the board. *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 2990646 at *5 (S.D.N.Y. Nov. 7, 2005) (quoting *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 1881514, at *3–*4, *9– *10 (S.D.N.Y. Aug. 5, 2005)).

*§ 10(b) Claim Against GEF Defendants*

■ Stating a claim under § 10b and Rule 10b–5 requires the Plaintiff to allege that the Defendant made the statement(s) that triggered liability. The Supreme Court held in *Janus,* that under Rule 10b– 5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus,* 131 S.Ct. at 2302. Here, Plaintiffs have failed to plead that the GEF Defendants were the makers of either the IPO Offering Documents or the SPO Offering Documents. Plaintiffs do not plead that the GEF Defendants had any authority, much less "ultimate authority," over either of the offering documents. Plaintiff's have failed to state a § 10b claim against the GEF Defendants for either offering, thus those claims are DISMISSED.

The GEF Defendants' motion to dismiss is GRANTED.

### Conclusion

DGW's motion to strike (docket entry # 116) is DENIED. The Underwriter Defendants' motion to dismiss (docket entry # 123) is DENIED. DGW and Guo's motion to dismiss (docket entry # 115) is DENIED. Defendant Stephen C. Park's motion to dismiss (docket entry # 111) is DENIED.

Grant Thornton International's motion to dismiss (docket entry # 117) is GRANTED. Defendants Rooney, Firlotte, and Larrea's motion to dismiss (docket entry # 108) is GRANTED. Defendant Yu's motion to dismiss (docket entry # 115) is GRANTED. Defendant Holbert's motion to dismiss (docket entry # 145) is GRANTED. Defendants Global Environmental Fund's motion to dismiss (docket # 125) is GRANTED.

SO ORDERED.